**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

LEE ANN SOMMERVILLE,

Plaintiff,

v. CIVIL ACTION NO. 2:19-cv-00878

UNION CARBIDE CORPORATION, et al.,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is Plaintiff Lee Ann Sommerville's Motion to Certify Class. [ECF No. 313]. Defendants Covestro LLC ("Covestro") and Union Carbide Corporation ("Union Carbide") each responded in opposition, [ECF Nos. 358; 359], to which Plaintiff replied, [ECF Nos. 375; 376]. In light of the intervening appellate proceedings and the reopening of this matter on remand, the court permitted supplemental briefing to be filed regarding Plaintiff's Motion to Certify Class. On July 17, 2026, Plaintiff filed a Supplemental Memorandum of Law. [ECF No. 432]. On August 20, 2026, Defendants each responded in opposition, [ECF Nos. 471; 470], to which Plaintiff replied on September 4, 2026, [ECF Nos. 502; 503]. Also pending is Plaintiff's Motion to Redefine the Class. [ECF No. 493]. Defendants each responded in opposition, [ECF Nos. 510; 509], to which Plaintiff replied, [ECF No. 511].

Defendants own and operate a manufacturing facility in South Charleston, West Virginia (the "South Charleston Plant").[1] Plaintiff, on behalf of herself and others similarly situated, brings this action against Defendants for alleged exposure to ethylene oxide ("EtO"), an odorless, colorless, carcinogenic gas. [ECF No. 85, ¶ 33 ("*Second Amended Complaint*")]. Plaintiff and the proposed class of approximately 37,000 people[2] reside in neighborhoods surrounding the South Charleston Plant. Plaintiff seeks a medical monitoring fund for the alleged exposure as a result of the Defendants' alleged EtO emissions, which Plaintiff alleges has significantly increased hers and the putative class's risk of developing cancer. *Id.* ¶ 1; [ECF No. 314, at 2].[3] For the reasons

[1] The Second Amended Class Action Complaint, which is the operative Complaint in this case, refers solely and exclusively to the South Charleston Plant. Inexplicably, Plaintiff Sommerville's briefing in support of the Motion to Certify seeks certification of a class affected by emissions from both the South Charleston Plant and Institute Plant. *Compare e.g.*, [ECF No. 85, ¶ 1 ("Plaintiff brings this class action against Defendants, owners and operators of a manufacturing facility in South Charleston, West Virginia ('the South Charleston Plant'), for damages resulting from Defendants' dangerous and reckless emission of ethylene oxide ('EtO')."), ¶ 4 ("Plaintiff and Class Members have lived in the vicinity of Defendants' South Charleston Plant . . . "), ¶ 7 (referring to "Defendants' South Charleston Plant"); ¶ 8 ("As a result of Defendants' operations at Defendants' South Charleston Plant . . . "), ¶¶ 9, 12–13, 15–16, 18–19, 21, 23, 28–29, 34, 40–46, 49–52, 54, 57–58, 75, 87–88, 94, 98, 101, 105]; *with* [ECF No. 314, at 2 ("On behalf of herself and all others similarly situated who were harmed by . . . Defendants'[] dangerous and negligent emission of . . . ethylene oxide ('EtO'), over the course of over four decades in and around their manufacturing facilities in Institute, West Virginia (the 'Institute Plant') and South Charleston, West Virginia (the 'South Charleston Plant'), Plaintiff seeks a medical monitoring fund.")]. The expert reports also combine calculations based upon emissions from both the South Charleston and Institute plants. *E.g.*, [ECF 313-1, at 11 (Dr. Sahu explaining his methodology and conclusions to determine cumulative exposure are based upon "activities relevant to air pollution controls and waste management practices employed by Defendants at the Institute and South Charleston facilities"); ECF No. 313-3 (Dr. Martin T. Wells's Report, which calculates relative risk based upon Dr. Sahu's cumulative exposure figures); *id.*, at 6 ("According to Dr. Sahu's analysis, . . . [Plaintiff Sommerville's] cumulative exposure to defendants' ethylene oxide emissions in the years 2001–2003, 2005–2019 . . . equate[s] to 340.558 in-a-million increase in relative risk."); ECF No. 313-4 (Dr. Charles Cowan's report, which calculates the number of class members "exposed to high levels of EtO gas from Defendants' manufacturing operations"); ECF No. 315-1 (Dr. Cowan's rebuttal report, which represents "[c]ases of Hodgkin Lymphoma, Non-Hodgkin's Lymphoma and Leukemia in Kanawha County, WV are . . . highly correlated with emissions of ethylene oxide from the Institute and South Charleston facilities . . . ")]. Because the allegations concerning the Institute Plant appear for the first time in the class-certification briefing and are not included in the operative Complaint, they present a pleading issue addressed later in this Memorandum Opinion and Order.

[2] *See* [ECF No. 314, at 8 (citing ECF No. 313-4, ¶ 54) (acknowledging Plaintiffs' expert, "Dr. [Charles] Cowan[,] estimates that there are approximately 37,000 people in the Class")]. Notably, Plaintiff cites Dr. Cowan's rebuttal report, which is located at ECF No. 313-4, but the rebuttal report does not contain the information Plaintiff cites. Dr. Cowan also provided Plaintiffs with an expert report dated February 17, 2023, which Plaintiffs did not include with their certification briefing, but which Defendant Covestro included in its Motion to Exclude Dr. Charles Cowan's Original Report, [ECF Nos. 315; 315-1]. Regardless, I refer to the proposed class as totaling approximately 37,000.

[3] All page number references reflect CM/ECF page numbers.

discussed below, I **DENY** the Motion to Redefine the Class, [**ECF No. 493**], and **DENY** the Motion to Certify Class. [**ECF No. 313**].

Plaintiff Sommerville says Defendants have released EtO into the air for over 40 years, that she and proposed class members breathed it, and that they now face a higher chance of getting cancer than they otherwise would. Plaintiff is not currently sick, but she wants Defendants to pay for regular medical tests—for her and putative class members—so that if cancer comes, it will be caught early.

West Virginia allows medical monitoring claims. *Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133, 522 S.E.2d 424 (1999). And the United States Court of Appeals for the Fourth Circuit held Plaintiff has standing to bring it. *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 421 (4th Cir. 2025), *cert. denied*, 146 S. Ct. 2677, 224 L. Ed. 2d 857 (2026). The court of appeals also held Plaintiff's air-modeling expert, Dr. Ranajit Sahu, may testify. *Id.* at 421, 426–27. I do not now revisit standing or the admissibility of Dr. Sahu's testimony. Now, the question is, assuming the admissibility of the testimony of the parties' experts,[4] whether any of Plaintiffs' proposed class definition is certifiable such that the proposed class of 37,000 people can try their cases together.

A plaintiff seeking medical monitoring must show the defendant's tortious conduct significantly exposed her—relative to the general population—to a hazardous substance, that the exposure proximately caused an increased risk of serious disease, that the raised risk makes the

[4] "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184 (2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 376 n.6, 131 S. Ct. 2541, 2566 n.6 (2011)); *Spurlock v. Wexford Health Sources, Inc.*, 175 F.4th 232, 252 (4th Cir. 2026) ("While class certification analysis may entail some overlap with the merits of the plaintiff's underlying claim, . . . it is not appropriate to treat class certification as a merits-determination or to delve into the merits further than necessary to satisfy the requirements of Rule 23.") (citation modified). The court does not now rule on the merits of the *Daubert* motions, but assumes the admissibility under *Daubert* of the expert testimony for the purposes of class certification.

testing medically necessary, and that monitoring procedures exist. *Id.* at 416 (citing *Bower*, 522 S.E.2d at 430–31).

Plaintiff seeks medical monitoring not just for herself—but for roughly 37,000 other people too. A plaintiff seeking class certification must show, among other things, (1) the class members can be determined by considering objective criteria without being administratively infeasible for the court, (2) the plaintiff's claim is typical of the class as a whole, (3) enough similarities exist among the proposed class such that the court can arrive at common answers able to resolve the litigation, and (4) whether common questions among the class as a whole predominate over individual questions such that it makes sense to warrant adjudication by representation.

Under these standards, granting the motion for class certification would require finding both that Plaintiffs have satisfied the class certification requirements and that their evidence makes a prima facie showing of each Bower element outlined above. Critically, in order to certify, I must determine that each *Bower* element is susceptible to generalized, class-wide proof.

Plaintiff Sommerville has not carried her burden for class certification. Six independent reasons preclude me from granting the motion.

First, the proposed class definitions within the Motion to Certify, [ECF Nos. 313; 314], and the Motion to Redefine the Class, [ECF Nos. 493; 494], rely unpled evidence regarding the Institute Plant. Absent a formal amendment under Federal Rule of Civil Procedure 15 expanding the scope of the claims and the allegations upon which they rest in the operative Second Amended Complaint, this case remains based solely on emissions from the South Charleston facility.

Second, the proposed class is a fail-safe class because membership depends on whether a putative class member has a valid claim on the merits.

Third, ascertainability is lacking because determining class members would be administratively infeasible since the court will be unable to determine class members until after a legally cognizable injury has been established.

Fourth, Plaintiff Sommerville's claims are not typical of the proposed class because it includes individuals who lived in the Class Zone before 2000 and minor class members.

Fifth, predominance is lacking because individualized inquiries regarding causation, fault-allocation, resultant damages, "significant exposure," and "increased risk" predominate over individual questions.

Sixth, and finally, superiority is lacking because Plaintiff Sommerville has not shown a class action is, in fact, the best and most efficient manner of adjudication—particularly in light of the aforementioned defects. Most critically, the proposed class definition is overbroad and would be too difficult to manage.

## I. BACKGROUND

This case concerns Plaintiff and a putative class of 37,000 people in communities surrounding the South Charleston Plant. Union Carbide has owned and operated the South Charleston Plant since at least 1978. [*Second Amended Complaint*, ¶¶ 41, 44]. In 2000,[5] Covestro began "operat[ing] polyols facilities" at the South Charleston Plant. *Id.* ¶¶ 41, 43–44. Plaintiff alleges Defendants' operations at the South Charleston Plant released toxic EtO into the surrounding environment, that proposed class members inhaled these emissions, and the resulting

[5] Covestro's predecessors in interest—Bayer Corporation, Bayer Polymers LLC, and Bayer MaterialScience LLC ("Bayer")—purchased the polyols operations at the South Charleston Plant from the Lyondell Chemical Company and other entities, with the transfer of ownership effective April 1, 2000. [ECF No. 358-1, ¶¶ 4–5 n.1]. Covestro spun off from Bayer in 2015. [*Second Amended Complaint*, ¶ 43–44]. While Covestro itself did not exist as a separate entity until 2015, and did not own the South Charleston Plant until 2015, the polyols operations that Covestro ultimately acquired have been operated at the South Charleston Plant since April 1, 2000. [ECF Nos. 358-8, at 11; 359-4 at 11 ("*Machado Expert Report*")].

exposure has significantly increased their risk of developing cancer. *Id.* ¶¶ 48, 59, 62. Based on this alleged increased risk, Plaintiff asserts that she and the proposed class have a present need for medical monitoring and seeks to require Defendants to bear the costs of a medical monitoring program. *Id.* ¶¶ 62, 86.

### A. Union Carbide and Covestro's South Charleston Plant Operations

The South Charleston Plant is a "sprawling, complex chemical manufacturing operation" in West Virginia's Kanawha Valley comprising numerous interconnected manufacturing steps and process areas. [ECF Nos. 313-1, at 14, 17; 358-4, at 14, 17; 359-7, at 14, 17 ("*Sahu Expert Report*")]. Both Union Carbide and Covestro operate process areas within the South Charleston Plant. *Id.* at 17–18. Although Defendants both operate within the same overall facility, their respective process units and operations are distinct. [*Sahu Expert Report*, at 17–18; *Sahu Deposition*, at 234–36; ECF No. 375-2, at 2–3 ("*Sahu Supplemental Expert Report*")]. Union Carbide operates multiple process areas at the South Charleston Plant, including the Chemical Mixing, Oxide Adducts, and TRITON areas, whereas Covestro has operated the South Charleston Plant's polyols operations since April 1, 2000. [*Machado Expert Report*, at 17; *Second Amended Complaint*, ¶¶ 41–44; ECF Nos. 358-1, ¶¶ 4–5 ("*Unsworn Declaration of Robert Lenahan*"); 358-2, at 234–36 ("*Sahu Deposition*"); *Sahu Supplemental Expert Report* (noting Covestro's operations include the following "sources of EtO emissions[:] . . . Reactor #8, . . . Building 103, and . . . "Phase IV")].

Although different before 1988, bulk shipments of EtO currently arrive at Union Carbide's neighboring Institute Plant[6] via rail tank cars and are stored in two underground tanks. [*Sahu*

[6] [*Machado Expert Report*, at 9 ("the Institute facility . . . is located approximately five miles west of the South Charleston facility")].

*Supplemental Expert Report*, at 14, 20]. From the Institute Plant, Union Carbide transports the chemical six miles through an underground pipeline to the South Charleston Plant. *Id.* at 14, 21. The EtO is then distributed to different batch reactors across the South Charleston facility, where it is reacted with other chemicals to produce various products.[7] [*Machado Expert Report*, at 18]. Because EtO is readily ignitable, its use during reactions to create the products is subject to safety procedures and controls, including limits on the amount of unreacted EtO present in a reactor. *Id.*

During the South Charleston Plant's operations, EtO may be released into the air through both point sources and fugitive sources. [ECF No. 359-9, at 53–54]. Point-source emissions are releases from designated, identifiable discharge points, such as stacks, ducts, pipes, or vents.[8] This occurs at the conclusion of reactions intended to create various products as described above; residual unreacted EtO may be vented to the atmosphere or routed through additional control devices. *Id.* at 53; *see also* [*Machado Expert Report*, at 18]. Fugitive emissions, by contrast, are releases that do not pass through a designated discharge point and instead occur from equipment such as valves, pumps, flanges, and other connectors. *Id.* at 54.[9]

Plaintiffs dispute the efficacy of Defendants' measures to control EtO emissions. [*Second Amended Complaint*, ¶ 55; *see generally Sahu Expert Report*; *Sahu Supplemental Expert Report*]. Plaintiffs allege in the operative Second Amended Complaint that Defendants have significantly underestimated their EtO emissions and failed to adequately address them. [*Second Amended Complaint*, ¶¶ 53–57]. Plaintiffs allege putative class members in the surrounding communities

---

[7] These products have applications as cleaners, de-greasers, deicers, paints and paint primers, brake fluid, and personal care products, [*Machado Expert Report*, at 12], as well as chemical additives for gasoline, jet fuels, water-based paints, cheese, baked goods, and other foods, [*Sahu Expert Report*, at 13].

[8] *See Sommerville*, 149 F.4th at 423 n.4 (quoting ECF No. 410, at 22 n.5) ("'Point source' or 'stack emissions' are 'air releases that occur through identifiable confined air streams, such as stacks, ducts or pipes.'") (citation modified).

[9] *See Sommerville*, 149 F.4th at 423 n.4 (quoting ECF No. 410, at 22 n.5) ("'[F]ugitive emissions' are 'releases to air that don't occur through a confined air stream' such as via 'equipment leaks.'")

were exposed to elevated ambient concentrations of EtO for decades, increasing their risk of developing cancer, which Plaintiffs allege requires medical monitoring. *Id.* at 61; *see generally* [ECF Nos. 313-2 ("*Stayner Expert Report*"); 313-3 ("*Wells Expert Report*")].

**B. Plaintiffs' Medical-Monitoring Theory**

"A claim for medical monitoring seeks to recover the anticipated costs of long-term diagnostic testing necessary to detect latent diseases that may develop as a result of tortious exposure to toxic substances." *Bower*, 522 S.E.2d at 429. West Virginia recognizes a cause of action for medical monitoring expenses "where it can be proven that such expenses are necessary and reasonably certain to be incurred as a proximate result of a defendant's tortious conduct." *Id.* at 431. In order to prevail on a medical monitoring claim, a plaintiff must prove that:

> (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of exposure; and (6) monitoring procedures exist that make the early detection of a disease possible.

*Id.* at 432–33; *see also Sommerville*, 149 F.4th at 416 (quoting *id.*).

Critically, *Bower* does not require present physical injury—the exposure itself and the concomitant need for medical testing constitute the injury. *Id.* at 430–431; *see also Sommerville*, 149 F.4th at 419. Nor does *Bower* require a particular quantification of the increased risk. *Bower*, 522 S.E.2d at 433. But the plaintiff must show that the exposure resulted in a significantly increased risk of a serious latent disease compared to the risk that would exist absent the exposure. *Id.*

Finally, the defendant's conduct must be a proximate cause of the significantly increased risk. *Bower*, 522 S.E.2d at 433. Thus, where a plaintiff's prior risk or exposure was already

sufficient to warrant the same monitoring sought as a result of the defendant's subsequent conduct, plaintiff's subsequent exposure does not itself create a compensable monitoring expense. *Id.* (quoting *Hansen v. Mountain Fuel Supply*, 858 P.2d 970, 980 (Utah 1993)). Accordingly, the plaintiff must establish that the defendant's tortious conduct contributed to a significantly increased risk that would not otherwise have existed. *Bower*, 522 S.E.2d at 433.

Plaintiffs assert Defendants owed a duty of reasonable care to neighboring communities to prevent off-site toxic contamination, and contends that Defendants breached that standard by operating the South Charleston Plant without adequate emission controls. [*Second Amended Complaint*, ¶¶ 48, 53]. Plaintiffs' Complaint attempts to distinguish distinguishes between Defendants based on their respective operational timelines and roles.

With respect to Union Carbide, Plaintiffs' theory of liability as pleaded in the operative Second Amended Complaint encompasses over four decades of chemical production, which Plaintiffs allege was marked by unverified flare destruction efficiencies, unmonitored fugitive equipment leaks, failed compliance testing, and historical facility-wide releases across three process units. [*Second Amended Complaint*, ¶ 41; *Sahu Expert Report*, at 13, 47–49, 65]. Plaintiffs allege that these practices resulted in the tortious release of carcinogenic EtO into the surrounding community. [*Second Amended Complaint*, ¶ 41].

As to Covestro, Plaintiffs pled that duty and breach arise from its active operation of polyols facilities at the South Charleston Plant since 2000. [*Second Amended Complaint*, ¶ 44; ECF No. 358-1, at 4–5 n.1; *Sahu Supplemental Expert Report*]. Because polyols production relies directly on EtO as a chemical feedstock, Plaintiffs contend that operating these units inherently generated point-source process vents and fugitive equipment leaks, and that Covestro breached its standard of care by conducting these operations without using leak-free components to minimize

or eliminate its EtO emissions. [*Sahu Deposition*, at 296–97]. Plaintiffs likewise allege both Defendants failed to assess the impacts to the densely populated residential community when deciding to emit EtO from the South Charleston facility. [*Sahu Expert Report*, at 29, 67; *Sahu Deposition*, at 295–97 (Dr. Sahu testifying that his standard of care opinions apply to all Defendants, including Covestro)].

Plaintiffs assert they will establish tortious conduct through a combination of evidence concerning Defendants' operations, emissions practice, and compliance with applicable regulations and controls, together with expert opinions regarding the sources and quantities of EtO released from those operations. [*Sahu Expert Report*]. Whether that evidence establishes a breach of a duty of reasonable care, as opposed to merely demonstrating that EtO was emitted, is a distinct question from whether Plaintiffs can establish the resulting significant exposure and increased risk required under *Bower*. Plaintiffs must establish that Defendants' tortious conduct caused the significant exposure and increased risk requiring periodic monitoring as required by *Bower*.

Plaintiffs rely exclusively on expert testimony to make that connection. Plaintiffs' experts will rely on quantitative air dispersion modeling to estimate ambient EtO concentrations attributable to Defendants' emissions. [*Sahu Expert Report*, at 68–69, 78; *Sahu Deposition*; *Sahu Supplemental Expert Report*]. The resulting modeled concentrations are then used to calculate the cumulative EtO exposure experienced by Plaintiff Sommerville and members of the proposed class. *See* [*Sahu Expert Report*, at 68–69, 78]. Plaintiffs' experts use those estimated exposures to quantify the resulting relative risk of cancer. [*Wells Expert Report*; *Stayner Expert Report*]. Plaintiffs contend the calculated risk for proposed class members exceeds 1 in 10,000—a level that the medical experts opine makes periodic diagnostic medical monitoring reasonably necessary to detect latent cancers. [ECF No. 313-9 ("*Knopf Expert Report*")].

Plaintiffs' theory thus relies on a series of evidentiary links: Defendants' operations allegedly generated EtO emissions; those emissions allegedly resulted in significant exposure to Plaintiff Sommerville and proposed class members; and the resulting exposure allegedly increased their risk of serious latent disease sufficiently to make medical monitoring reasonably necessary. Different experts address different links in that chain. Their respective opinions, and the extent to which those opinions reliably establish each required *Bower* element, provide important context for the parties' class-certification arguments.

**C. Plaintiffs' Experts**

Plaintiffs' proof runs through five experts, each handing off to the next. Plaintiffs' experts address distinct aspects of the proposed proof, including emissions, exposure, causation, and increased risk to meet *Bower*'s requirements. Plaintiffs' experts include Dr. Ranajit Sahu, [*Sahu Expert Report*; *Sahu Supplemental Expert Report*], Dr. Martin Wells [*Wells Expert Report*], Dr. Leslie T. Stayner, [*Stayner Expert Report*], Dr. Kevin Knopf, [*Knopf Expert Report*], and Dr. Charles Cowan [ECF Nos. 359-22 ("*Cowan Expert Report*"); 313-4 ("*Cowan Rebuttal Report*").

Dr. Sahu takes the plant's emissions records, weather data, and other records and uses them to calculate how much EtO was in the air at fourteen census tracts around the South Charleston and Institute plants, year by year to determine Plaintiff's and putative class members' cumulative exposure.

Dr. Wells takes Dr. Sahu's cumulative exposure calculations and uses them in his own model to determine a putative class member's estimated increased lifetime risk of lymphoid cancer as a result of their exposure, which he calls their "relative risk." [*Wells Expert Report*, at 3, 5–6]. Dr. Wells opines an increased risk of one in 10,000 is a significantly increased risk. *Id.*

Dr. Stayner opines regarding general causation and identifies which cancers are caused by EtO exposure.

Dr. Knopf testifies that anyone whose risk went up by at least one in 10,000, the number identified by Dr. Wells, ought to be enrolled in a monitoring program.

Dr. Cowan testifies to the exposed populations, including the number of people who were allegedly exposed to EtO.

1. Dr. Ranajit Sahu (Process Engineering and Emissions)[10]

Dr. Ranajit Sahu, a mechanical engineer with over thirty years of experience, serves as Plaintiffs' process engineering and emissions expert. [*Sahu Expert Report*, at 6–7]. In this expert report, Dr. Sahu provides an expert opinion on EtO "emissions . . . from Union Carbide's Institute and South Charleston facilities . . . between 1984 and 2019." *Id.* at 6.[11] Dr. Sahu identifies five process areas at the South Charleston Plant that he associates with EtO use or emissions during the period from 1984 through 2019. *Id.* at 17–18, 38–39. Within those areas, he identifies both point-

[10] I note a potential issue concerning Dr. Sahu's use of "UCC" and "Union Carbide" in his report. At his deposition, Dr. Sahu testified that he used those terms generically to refer to the operations at the South Charleston and Institute Plants as a whole, without distinguishing among the entities that owned or operated particular facilities or process units during the relevant period. He explained: "I was using UCC generically as a site, both Charleston and West Virginia without getting into ownership." [*Sahu Deposition*, at 240–41, 291 ("When I wrote that report, I was referring to the entire plant of Union Carbide without distinguishing between different owners and different operators at different time period[s]."), 292–97]. Dr. Sahu further testified his opinions concerning leak detection programming ("the LDAR"), "fugitive emission estimates," "the citing of official operations," "extended cookout," "reactors" and "standard of care" were applicable to Covestro as well. *Id.* at 292.

[11] I note the following foundational issue with the dates in the proposed class definitions in both the Motion to Certify, [ECF No. 313], and Motion to Redefine Class, [ECF No. 493], in light of Dr. Sahu's report. The class period as pled in the Complaint begins in 1978. [*Second Amended Complaint*, ¶ 69]. The Motion to Certify identifies the class period beginning in 1981. [ECF Nos. 313; 314]. On September 4, 2026, Plaintiff filed a Motion to Redefine the Class. [ECF No. 493]. Plaintiff seeks to redefine the class to, among other things, change the relevant class period back to beginning in 1978. *See* [ECF Nos. 493; 494]. The issue for both dates, which is discussed further below, is that Dr. Sahu's analysis begins in 1984. *See* [*Sahu Expert Report*, at 6 ("The time period of this analysis is between 1984 and 2019."). Accordingly, the class period could not be defined to include pre-1984 conduct because Plaintiff has no pre-1984 evidence since that's when Dr. Sahu's analysis begins.

source and fugitive sources of EtO emissions, including process vents, storage tanks, railcar-loading operations, and potential releases from valves, pumps, and pipe fittings. *Id.* at 38–40.

Dr. Sahu also evaluates the measures used to control EtO emissions and the operational practices at the two Plants. He notes that Union Carbide used industrial flares at the Institute Plant to combust excess EtO but that "[n]o flares are known to exist at the South Charleston plant for EtO destruction." *Id.* at 29, 65. Union Carbide reported that its Institute Plant flares achieved 99.8-percent EtO destruction efficiency. *Id.* at 41–45. Dr. Sahu opines, however, that this figure was based on a 1987 internal memorandum rather than testing conducted under actual operating conditions. *Id.* He further notes that the underlying small-scale testing did not account for wind conditions. *Id.* at 41–42. When the flares were subsequently tested in May 2002, they failed to satisfy the applicable heat requirements. *Id.* at 47–49. Dr. Sahu further opines that Union Carbide did not report those failed test results to regulators and did not conduct subsequent testing of the flares. *Id.* at 49.

Dr. Sahu likewise addresses Defendants' controls for fugitive emissions and their operational practices. He opines that a substantial portion of the EtO emissions from the two Plants consisted of "uncontrolled fugitive emissions," arising "from leaking equipment and other sources." [*Sahu Expert Report*, at 65]. With respect to the facilities' leak detection programs, Dr. Sahu identifies a 500-parts-per-million threshold for triggering repairs. *Id.* at 65–66. He opines that the operators did not evaluate the effectiveness of the leak detection programs or quantify the extent to which EtO emissions from fugitive sources reached the surrounding community. *Id.* Dr. Sahu likewise addresses the use of extended cookout procedures, opining the operators lacked data demonstrating that extended cookout reduced EtO emissions under normal operating conditions. *Id.* at 65.

Dr. Sahu further opines that the operation of the facilities did not adequately account for the proximity of surrounding residential communities. *Id.* at 67. He found there was no evidence that Defendants considered the proximity of nearby residential communities when locating or expanding their EtO-related operations. *Id.*

Because comprehensive, facility-specific emissions records were unavailable for portions of the relevant historical period (1985 through 1995), Dr. Sahu reconstructed a year-by-year inventory of EtO emissions from the two Plants from 1984 through 2019. [*Sahu Expert Report*, at 32–39, 55–64]. To fill gaps in the historical records, he relied on a combination of Defendant's internal records from 1996 through 2019, state environmental filings, historical West Virginia Air Pollution Control Commission records, and federal Toxics Release Inventory ("TRI") data. *Id.*

Using this reconstructed emissions inventory, Dr. Sahu directed an air-dispersion modeling analysis using the United States Environmental Protection Agency's ("EPA") AERMOD model, which Dr. Andrew Gray performed under Dr. Sahu's supervision. *Id.* at 68. The analysis was designed to estimate how EtO released from the two Plants would have dispersed through the surrounding air and the concentrations that would have been present at various locations from 1984 through 2019. *Id.* Dr. Sahu divided the emission sources into four groups: South Charleston source units other than tanks, South Charleston tanks, Institute source units other than flares, and the two elevated Institute flares. *Id.* at 69, 77. The model accounted for the location and physical characteristics of each emission source so that it could estimate how EtO released from that source would disperse through the air. *Id.* at 69. The source locations and other parameters used in the model were drawn primarily from West Virginia Department of Environmental Protection ("WVDEP") modeling files and, for certain additional sources, documents produced in discovery. *Id.* at 69, 77–78. The model then estimated EtO concentrations at locations throughout a grid

surrounding the two Plants, as well as at two specific residential addresses used as examples. *Id.* at 70–77. To account for the role of weather in determining where emissions travel, the model also incorporated historical meteorological data, including site-specific data for most sources and year-specific data for the two elevated Institute flares based on their height and plume characteristics. *Id.*

Dr. Sahu explained at his deposition that the AERMOD analysis predicts ambient EtO concentrations at outdoor receptor locations—that is, the concentration of EtO in the outdoor air at a particular location. [*Sahu Deposition*, at 118–19]. Dr. Sahu testified the model can predict the concentration at any location designated as a receptor, depending on how the model is configured. *Id.* at 119. Dr. Sahu acknowledged that ambient concentrations may differ from concentrations in particular indoor environments, such as homes, workplaces, schools, and vehicles. *Id.* at 118–19. Still, he opines that, on an annual-average basis, differences between indoor and outdoor EtO concentrations are not material because of the substantial exchange of air between indoor and outdoor environments. [ECF No. 442-3, at 13 ("*Sahu Rebuttal Report*"). He further notes that EtO can persist in the air for extended periods, such that outdoor air containing EtO that enters a building does not simply dissipate rapidly. *Id.* Based on these considerations, Dr. Sahu opines that the ambient concentrations estimated by his model provide an appropriate basis for evaluating an individual's exposure, including while that individual is inside the home. *Id.*

Dr. Sahu next used those modeled ambient concentrations to evaluate the extent of EtO exposure at various locations. He compared the ambient EtO concentrations estimated at the two example residences and throughout the broader modeling area with EPA's national average background EtO concentration and a cumulative exposure-based cancer-risk threshold. *Id.* at 78–83. After his May 2023 deposition, Dr. Sahu identified a discrepancy in the emission rates used

for certain Covestro-associated sources. Specifically, the model had used a constant 2017 emission rate for those sources rather than the year-by-year emission rates he had provided. [*Sahu Deposition*; *Sahu Supplemental Expert Report*, at 1]. Dr. Sahu subsequently submitted a supplemental report presenting revised modeling results using the year-by-year emission rates. *Sahu Supplemental Expert Report*, at 1. He concluded that the revised inputs did not materially change the estimated EtO concentrations or alter his opinions.[12] *Sahu Supplemental Expert Report.*

Dr. Sahu opines that his modeling can separately account for EtO emissions attributable to Covestro's operations. Covestro's South Charleston operations include identified emission points associated with its polyols production, and Dr. Sahu treats those sources as a discrete source group within the South Charleston Plant. [*Sahu Expert Report*, at 68–69, 78]. He testified that his model can isolate the emissions attributable to that source group and distinguish them from emissions associated with other sources at the Plant. [*Sahu Deposition*, at 297–98]. In identifying the information specific to Covestro that he considered, Dr. Sahu pointed to Covestro's reported emissions, the emission sources associated with its polyols operations, and the information used as inputs to his dispersion model. *Id.* Thus, although Covestro's sources are incorporated into his broader South Charleston analysis, Dr. Sahu testified his modeling permits him to separately model Union Carbide's and Covestro's identified sources to the ambient EtO concentrations. Further, although his model combines emissions from the Institute and South Charleston plants, he testified

[12] I do not now revisit the admissibility of Dr. Sahu's testimony. But I previously noted "[t]he accuracy of the model depends upon the rigor applied in the input gathering process" and, based on a number of issues, I concluded Dr. Sahu based his data on his own assertions rather than critically examining the operation history. [ECF No. 410, at 23–25 (citation modified)]. The Fourth Circuit concluded I abused my discretion in so deciding because I "ignored Dr. Sahu's testimony" from his supplemental report. *Sommerville*, 149 F.4th at 426.

his model is capable of separately modeling only emissions from the South Charleston Plant. [*Sahu Rebuttal Report*, at 20].

Dr. Sahu also offers opinions concerning the standard of care applicable to the operation of the relevant process units. He testified that operators of those units could have exercised greater care in handling EtO, including by using leak-free components to reduce or eliminate fugitive emissions. [ECF No. 358-2, at 296–98]. He likewise addresses the use of leak detection programs, fugitive-emission controls, extended-cookout procedures, and reactor operations, and testified that those opinions apply to both Union Carbide and Covestro. *Id.* at 292, 296–98. With respect to Covestro specifically, Dr. Sahu noted that Covestro continued to report fugitive EtO emissions from its polyols operations in 2017 through 2019 and that he saw no indication that Covestro had replaced those fugitive emission sources with leak-free technology. *Id.* at 296–98. Dr. Sahu admits he does not offer a separate, company-specific standard-of-care opinion directed solely to Covestro. Rather, his opinions concern the operation of the relevant process units and apply generally to the operators of those units. *Id.* at 296–97. Thus, his opinions regarding the adequacy of Defendants' operational and emissions controls are directed principally to the manner in which the relevant process units were operated, rather than to a separate evaluation of each company's corporate practices.

In sum, Dr. Sahu's analysis proceeds in several steps. He first reconstructs historical EtO emissions from the two Plants, identifies the sources responsible for those emissions, and uses those emissions estimates as inputs to an air-dispersion model. The model then estimates ambient EtO concentrations at locations throughout the surrounding area, including concentrations attributable specifically to Covestro's identified emission sources. Dr. Sahu uses those modeled concentrations to evaluate EtO exposure and compare the estimated exposure with background

concentrations and a cancer-risk threshold. His opinions concerning the reasonableness of Defendants' operational practices provide a separate basis for his opinions regarding whether those emissions resulted from inadequate controls or other tortious conduct. These opinions form the principal factual and technical foundation for Plaintiffs' effort to establish the exposure, causation, and increased-risk elements of the medical-monitoring claim.

2. Dr. Martin T. Wells (Biostatistics and Risk Modeling)

Dr. Martin T. Wells serves as Plaintiffs' biostatistics and quantitative risk assessment expert. Dr. Wells is a Professor of Statistical Sciences and Chair of the Department of Statistics and Data Science at Cornell University, where he also holds professorships in biostatistics and epidemiology at Cornell's medical school. [*Wells Expert Report*, at 2]. He has published more than 240 peer-reviewed articles and has extensive experience in statistical and epidemiological research. *Id.* Dr. Wells uses statistical modeling to estimate the relationship between cumulative EtO exposure and the risk of developing lymphoid cancer. *Id.*

Dr. Wells bases his analysis principally on epidemiological data from the National Institute for Occupational Safety and Health ("NIOSH") occupational cohort, which also formed the basis of the EPA 2016 EtO Integrated Risk Information System ("IRIS") assessment.[13] *Id.* at 3–4. Using that data, Dr. Wells constructed a dose-response curve for lymphoid cancer. *Id.* at 3. He selected a two-piece linear spline model[14] with a knot at 100 ppm x days ("the 100-knot model"). The 100-

[13] The EPA's 2016 IRIS assessment is the EPA's formal scientific assessment of the carcinogenicity of EtO from chronic inhalation exposure. *See* [*Wells Expert Report*, at 4; *Stayner Expert Report*; ECF No. 440-2, at 4 ("The purpose of this document is to provide scientific support and rationale for the hazard and dose-response assessment in the Integrated Risk Information System (IRIS) pertaining to carcinogenicity from chronic inhalation exposure to ethylene oxide (EtO).")].

[14] A spline model is a statistical model that allows the relationship between two variables to change at one or more specified points, rather than assuming that the same relationship applies across the entire range of data. [*Wells Expert Report*, at 3]. Here, the model allows the relationship between cumulative EtO exposure and cancer risk to differ above and below the selected "knot" or change point. [*Stayner Expert Report*, at 4–6].

knot model produced the lowest Akaike Information Criterion ("AIC") score among the models he evaluated, which Dr. Wells considers evidence that it provided the best statistical fit to the underlying data.[15] *Id.* In practical terms, the model allows the relationship between exposure and risk to change at a particular level of cumulative exposure rather than assuming that risk increases at the same rate at all exposure levels.

Dr. Wells's calculations treat cancer risk as a function of cumulative dose. *Id.* at 4–6. He therefore opines that, once an individual's cumulative EtO exposure has been quantified, his calculations can be used to estimate the corresponding relative risk of lymphoid cancer. *Id.* at 4–5. The calculations thus focus on the individual's total cumulative exposure rather than the timing or pattern of that exposure—that is, it does not distinguish between the same cumulative dose accumulated over months, years, or decades, or between exposures that fluctuate over time. *Id.*

Dr. Wells's risk estimates also differ in certain respects from the estimates the EPA uses for regulatory purposes. He relies on the central estimate of "relative risk," which he identifies as "the ratio of the probability of a specific outcome (e.g., disease, injury) occurring in a population exposed to a certain level of a risk factor compared to the probability of the same outcome occurring in a population that is not exposed to that risk factor." *Id.* at 3. According to Dr. Wells, "[t]he upper-end individual cancer risk of roughly 1 in 10,000 is often considered the upper limit of acceptability in relative risk." *Id.*

Dr. Wells applied his model to the named class representative using the cumulative EtO exposure estimate generated by Dr. Sahu. *Id.* at 6. Using Dr. Sahu's estimated exposure for Plaintiff Sommerville from 2001–2003 and 2005–2019, which relied on emissions from the South

---

[15] The AIC is a statistical measure used to compare competing models. It balances how well a model fits the observed data against the complexity of the model, with a lower AIC generally indicating a better fit relative to the alternatives being compared. AIC is a comparative measure; standing alone, an AIC value has no independent meaning. [*Wells Expert Report*, at 4].

Charleston and Institute Plants, Dr. Wells calculated an excess cancer risk of approximately 341 cases per million. *Id.* Dr. Wells opines that the same methodology can be applied to other individuals once their cumulative EtO exposures have been estimated using Dr. Sahu's model. *Id.* In his view, an individual's modeled cumulative exposure can be similarly applied to his calculations or an "automated risk calculator" could be used to generate that individual's corresponding increased cancer risk or "relative risk." *Id.*

In short, Dr. Wells provides the quantitative link between Dr. Sahu's modeled EtO exposures and an increased risk of cancer. Where Dr. Sahu's analysis estimates how much EtO an individual was exposed to, Dr. Wells's analysis uses that estimated cumulative exposure to calculate the corresponding increased risk of lymphoid cancer. Dr. Wells opines that the same methodology can be applied to each member of the proposed class based on that person's estimated cumulative EtO exposure.

3. Dr. Leslie T. Stayner (Epidemiological and General Causation Expert)

Dr. Leslie T. Stayner serves as Plaintiffs' expert on epidemiology and general causation. Dr. Stayner is Professor Emeritus of Epidemiology at the University of Illinois at Chicago School of Public Health, possessing over 40 years of professional experience in occupational and environmental epidemiology. [*Stayner Expert Report*, at 2]. He worked for twenty-three years at NIOSH, where he served as Chief of the Risk Evaluation Branch, and has served as a Senior Visiting Scientist at the International Agency for Research on Cancer ("IARC"). *Id.* at 2–4. He also chaired the 2008 IARC Monograph Working Group that classified EtO as a Group 1 known

human carcinogen and has authored or co-authored approximately 200 peer-reviewed scientific publications, including studies concerning EtO. *Id.* at 2, 5–7.

Dr. Stayner evaluates whether exposure to EtO can cause cancer in humans. *Id.* at 3. Based on epidemiological, biological, and animal evidence, he concludes that EtO exposure increases the risk of lymphohematopoietic cancers, including leukemia, non-Hodgkin lymphoma, and multiple myeloma, as well as female breast cancer. *Id.* at 4, 14. Dr. Stayner relies particularly on the NIOSH occupational cohort of more than 18,000 workers, which he considers the strongest epidemiological evidence concerning the relationship between EtO exposure and cancer. *Id.* at 5–7, 13. He also considers evidence that EtO can damage DNA and animal studies linking EtO exposure to cancer. *Id.* at 10–18. In his view, EtO exposure can increase the risk of the cancers at issue. *Id.* at 14.

Dr. Stayner further addresses the relationship between the amount of EtO exposure and cancer risk. He opines that the available evidence supports a non-threshold, supra-linear dose-response relationship, meaning that there is no particular level of exposure below which the risk of cancer is necessarily zero. *Id.* at 3, 13–14; [*Stayner Rebuttal Report*, at 3, 10]. He concludes that the relationship between exposure and risk may be steeper at lower environmental exposure levels than at the higher exposure levels experienced by occupationally exposed workers. [*Stayner Expert Report*, at 14]. He considers community exposures above background levels particularly significant because community members may be exposed continuously, unlike the more limited exposure periods typically experienced by occupational cohorts. *Id.*

Dr. Stayner, relying on Dr. Wells' report, acknowledges in his report "[t]he exposures in the community have been reported by the EPA to be associated with a risk greater than 1 in 10,000, which is well above the 1 in a million level of risk that is generally accepted by EPA and other

agencies as being a significant risk or in other words an unacceptable level of risk." [*Stayner Expert Report*, at 3]. However, Dr. Stayner's opinion is limited to one of general causation. *Id.* at 3 ("[E]xposure to ethylene oxide increases the risk of lymphatic and hematopoietic neoplasms in humans, as well as breast cancer in women."), 14 ("There is strong epidemiologic evidence for a causal association between ethylene oxide exposure for both breast cancer and lymphatic and hematopoietic neoplasms. It is my opinion that . . . a causal relationship exists between ethylene oxide exposure and these cancers."). Dr. Stayner does not independently offer an opinion regarding what relative risk amounts to a "significantly increased risk" or whether and at what level exposure to ethylene oxide results in a significant increase in risk of disease. *See* [ECF No. 436-1, at 29; 493-1, at 109-110 ("*Stayner Deposition*") ("Q. . . . [A]re you going to be offering an opinion in this case that a relative risk of 1.0033 or 1.0001 is a significantly increased level of risk? . . . [A.] No, I don't plan on offering an opinion on that. . . . [Q.] [D]o you intend to offer any opinions about what level of exposure to ethylene oxide results in a significant increase in risk of disease? A. No, I'm not. Dr. Wells will. Q. Okay. And do you agree that the risk of disease will vary based on each individual's exposure and dose of ethylene oxide? . . . [A.] Yes, it will vary depending on the level of exposure and duration of exposure for each individual[.]")].

In sum, Dr. Stayner supplies the epidemiological and scientific foundation for Plaintiffs' theory that EtO exposure can cause the cancers at issue and that the risk of those cancers increases with greater exposure.

4. Dr. Knopf (Medical Monitoring Protocol and Design)

Dr. Kevin Knopf serves as Plaintiffs' medical monitoring design expert. He is a board-certified hematologist and oncologist and serves as Chief of Hematology and Oncology at Alameda Health Systems in Oakland, California. [ECF No. 313-9, at 2]. His practice includes

cancer diagnosis, screening, and prevention, as well as the development and use of health-system databases to evaluate clinical outcomes and quality of care. *Id.* at 2–3.

Plaintiffs retained Dr. Knopf to determine whether a specialized medical monitoring program is reasonably medically necessary for members of the proposed class, and if so, to design a monitoring program capable of detecting the cancers at issue at an early stage. *Id.* at 1, 4–5; [ECF No. 477-2, at 3 ("*Knopf Rebuttal Report*"). Dr. Knopf does not independently offer an opinion that EtO causes the identified cancers. Rather, he assumes the "members of the Class have a significantly increased risk of developing non-Hodgkin lymphoma, Hodgkin's disease, leukemias, and multiple myeloma, as well as breast cancer" and evaluates whether those risks warrant medical monitoring and what such monitoring should entail. [ECF No. 313-9, at 2, 5].

Dr. Knopf proposes a comprehensive monitoring program designed to detect lymphoma, leukemia, and multiple myeloma at an earlier and more treatable stage, with the goal of improving survival and reducing the morbidity associated with delayed diagnosis. *Id.* at 6–30. The proposed program would use a HIPAA-compliant database to track participants and their health outcomes over time and would include patient education, counseling, and medical personnel to administer and oversee the program. *Id.* at 6, 10. The program also contemplates public education through an informational website, written materials, and physician guidance concerning potential warning signs of the cancers at issue. *Id.*at 8.

The proposed screening procedures vary depending on the disease. *Id.* at 10–28. Dr. Knopf also proposes a modified protocol for children that would limit more invasive testing unless clinical findings warranted it. *Id.* at 28–30. Dr. Knopf's program would require a multidisciplinary medical staff, including hematologists and oncologists, phlebotomists, radiologists or nuclear-

medicine physicians, diagnostic surgeons, hematopathologists, program nurses, and pediatric specialists. *Id.*

In establishing the clinical foundation for his design, Dr. Knopf evaluates the potential medical risks associated with each diagnostic element of the program, including phlebotomy, radiation or contrast exposure from imaging, invasive tissue biopsies, and the psychological anxiety associated with precursor labeling. *Id.* at 16–17, 20–21, 26–27, 30. Based on his clinical experience and review of the medical literature, Dr. Knopf opines that the health benefits of early malignancy detection significantly outweigh the minimal risks associated with the screening procedures. *Id.* at 6, 30. He concludes that the proposed protocol is reasonably medically necessary, differs from standard medical examinations ordinarily prescribed in the absence of EtO exposure, and provides a viable mechanism to achieve early detection and improved clinical outcomes for the exposed population. *Id.* at 4–6, 30.

In short, Dr. Knopf provides the medical-monitoring component of Plaintiffs' theory. His opinions assume the increased cancer risks identified by Plaintiffs' epidemiological and quantitative-risk experts and address whether those risks warrant specialized monitoring and, if so, what that monitoring should entail.

5. Dr. Charles D. Cowan (Class Demographics, Statistics, and Exposure Modeling)

Dr. Charles D. Cowan serves as Plaintiffs' demographic and statistical expert. Dr. Cowan is the Managing Partner of Analytic Focus LLC, a consulting firm specializing in the design, implementation, and evaluation of statistical and sampling techniques. [*Cowan Expert Report*, at 5]. He has more than 50 years of experience in economics, research methodology, and statistics. *Id.* His prior positions include Chief of the Survey Design Branch at the U.S. Census Bureau, Chief

Statistician at the National Center for Education Statistics, and Chief Statistician at the Federal Deposit Insurance Corporation. *Id.*

Plaintiffs initially retained Dr. Cowan to estimate the number of people currently living in Kanawha and Putnam Counties who were exposed to elevated levels of EtO from Defendants' facilities for at least one year between 1981 and the present. *Id.* at 4–7. To make that estimate, Dr. Cowan used a demographic "roll-forward" methodology, beginning with 1980 population data and accounting for births, deaths, and population movement into and out of the relevant areas. *Id.* at 10–19. He then combined those population estimates with the geographic exposure areas developed through Dr. Sahu's modeling to estimate the number of people who lived within areas affected by EtO emissions and the length of time they remained there. *Id.* at 10–13; [ECF No. 453-2, at 49, 52 ("Cowan Deposition")]. Dr. Cowan relied on census, health, property, and geographic data to estimate the population within different exposure areas over time. [*Cowan Expert Report*, at 10–19].

Dr. Cowan also addresses an analysis relied upon by Defendants' experts (the "Blankenship Presentation") that purported to show that hematologic cancers do not cluster around Defendants' facilities. [*Cowan Rebuttal Report*, at 6]. He criticizes that analysis for examining cancer rates across entire counties rather than within the areas affected by the EtO plume and for focusing on the location of the facilities rather than the areas where people were exposed. *Id.* at 6–16. He likewise questions the use of an EPA screening tool that identified a single peak-risk location rather than statistically testing whether cancer cases were associated with areas of EtO exposure. *Id.*

To further evaluate those issues, Dr. Cowan combined cancer-location data with Dr. Sahu's exposure estimates and performed statistical analyses examining whether cancer incidence was

related to proximity to the EtO plume and to cumulative EtO exposure. *Id.* He reports cancer incidence had a statistically significant relationship between with distance from the center of the plume and cumulative EtO exposure. *Id.* Based on those analyses, Dr. Cowan concludes that the available data demonstrate a relationship between EtO exposure and cancer incidence in the affected area, and he rejects the contrary view that no such relationship exists. *Id.*

In short, Dr. Cowan provides the demographic and statistical components of Plaintiffs' theory. His primary analysis estimates how many people lived within areas affected by Defendants' EtO emissions from the South Charleston and Institute facilities, and for how long, while his rebuttal analyses address whether cancer incidence is associated with the geographic areas and levels of EtO exposure identified through Dr. Sahu's modeling.

## II. LEGAL STANDARD

"The class action device is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citation modified)); *see Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "The premise is that 'litigation by representative parties adjudicates the rights of all class members.'" *G.T.*, 117 F.4th at 202 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998)). Thus, a party seeking class certification "must affirmatively demonstrate compliance" with Federal Rule of Civil Procedure 23. *Overby v. Anheuser-Busch, LLC*, 178 F.4th 175, 181 (4th Cir. 2026) (quoting *Wal–*

*Mart Stores, Inc. v. Dukes*, 564, U.S. 338, 350 (2011) (citation modified). "This is no perfunctory bar." *Id.*

Rule 23 "contains an implicit threshold requirement that the members of a proposed class be readily identifiable[,]" commonly referred to as "ascertainability." *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 206 (4th Cir. 2024) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)) (internal quotation marks omitted); *Kadel v. Folwell*, 100 F.4th 122, 160 (4th Cir. 2024) (en banc) ("This Circuit, and many others, have recognized an implicit requirement in 23(b)(1) and 23(b)(3) cases that members of a proposed class be 'readily identifiable.'"), *judgment vacated on other grounds sub nom. Folwell v. Kadel*, 145 S. Ct. 2838, 222 L.Ed. 2d 1124 (2025). As such, "class definitions must be written with specificity" to "provide proper detail to identify whether or not a prospective class member was injured and whether their claim coheres with the rest of the certified class." *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 681–82 (4th Cir. 2024). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

If, however, the class members are ascertainable, the certification inquiry continues to Rule 23(a), which provides pertinently as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "[C]ertification is proper only if 'the trial court is satisfied . . . that the prerequisites of Rule 23(a) have been satisfied." *Wal–Mart Stores, Inc.*, 564 U.S. at 350–51 (quoting *Falcon*, 457 U.S. at 160–61); *Comcast*, 569 U.S. at 33.

In addition to the subsection (a) requirements, a plaintiff seeking certification must also demonstrate the class action "fall[s] within one of the three categories enumerated in Rule 23(b)." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003); *see Stafford*, 123 F.4th at 678. Plaintiffs initially sought certification under Rule 23(b)(2), contending that the requested medical monitoring constitutes injunctive relief. [ECF No. 314, at 5]. The Fourth Circuit, however, has since characterized the relief sought in this action as "damages—not injunctive relief." *Sommerville*, 149 F.4th at 416. Accordingly, I analyze the Motion to Certify, [ECF No. 313], under Rule 23(b)(3).

Certification under Rule 23(b)(3) is appropriate when the following are satisfied: the threshold ascertainability requirement, the prerequisites of Rule 23(a), and the two requirements of Rule 23(b)(3). *See id.* at 2558. Specifically, (1) common questions of law or fact must predominate over any questions affecting only individual class members; and (2) proceeding as a class must be superior to other available methods of litigation. *See* Fed. R. Civ. P. 23(b)(3).

A district court has "broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)); *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 929 (4th Cir. 2025) (quoting *Lienhart*, 255 F.3d at 146). "The party seeking class certification bears the burden of proof." *Lienhart*, 255 F.3d at 146 (citing *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981)); accord *G.T.*, 117 F.4th at 202 (quoting *EQT Prod. Co.*, 764 F.3d at 357) ("Merely

pleading compliance with these requirements is not enough; rather, 'the party [seeking certification] must present *evidence* that the putative class complies with Rule 23.'") (emphasis added); *Stafford*, 123 F.4th at 679.

When evaluating whether class certification is appropriate, the court must "take a close look" at the "facts relevant to the certification question and, if necessary, make specific findings" relevant to certification. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citing *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004)); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) (stating that "the district court must rigorously examine the core issues of the case at the certification stage"). This is necessary even if "the issues tend to overlap into the merits of the underlying case." *Thorn*, 445 F.3d at 319 (citing *Falcon*, 457 U.S. at 160); *Comcast*, 569 U.S. at 33–34 (stating that the court's analysis "will frequently entail 'overlap with the merits of the plaintiff's underlying claim' . . . because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action'") (internal citations omitted). However, "courts may consider merits questions 'only to the extent necessary to verify that Rule 23 has been satisfied.'" *Williams v. Martorello*, 59 F.4th 68, 91 (4th Cir. 2023) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015)); *see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (stating that although class-certification analysis may overlap with the merits of a case, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage").

## III. DISCUSSION

### A. Scope of Proposed Class Definitions vs. Allegations in Operative Complaint

The question before the court is the appropriateness of class certification. Before I can analyze the appropriateness of class certification, I must first explain why there are two proposed class definitions before the court.

1. Class Definitions

The operative Second Amended Complaint sought certification of the following definition: "All natural persons who have resided within census tracts 54039000100, 54039012900, 54039000200 (the "class zone") for a period of one year or more, at any point between January 1, 1978 and the date of this complaint (the "class period.")" [*Second Amended Complaint*, ¶¶ 69–70]. The Motion to Certify sought certification of the following class:

> All natural persons who (a) have resided within census tracts 54039013200, 54039010200, 54039013600, 54039013300, 54039010600, 54039010701, 54039010500, 54039010400, 54039010300, 54039013400, 54039013500, 54039000100, 54039012900, and 54039000200 (the "Class zone") at any point between January 1, 1981 and the date of certification (the "Class period"); and (b) who, by virtue of their cumulative exposure to EtO, have at least a one in 10,000 increased risk of lymphoma, leukemia, and multiple myeloma.

[ECF No. 314, at 2]. Plaintiffs now seek to redefine the proposed class as follows:

> All natural persons who (a) have resided within census tracts 54039013200, 54039010200, 54039013600, 54039013300, 54039010600, 54039010701, 54039010500, 54039010400, 54039010300, 54039013400, 54039013500, 54039000100, 54039012900, and 54039000200 (the "Class zone") at any point between January 1, 1978 and the date of certification (the "Class period"); and (b) who, by virtue of their cumulative exposure to EtO, have at least a one in 10,000 increased risk of lymphoma, leukemia, and multiple myeloma.

[ECF Nos. 493, at 1–2; 494, at 1, 3]. Excluded from the proposed class are Defendants, and any of their affiliates, parents, subsidiaries; all their employees; all persons who have been diagnosed

with cancer; government entities; and the judges to whom this case is assigned, their immediate families and court staff. [ECF No. 314, at 2; *Second Amended Complaint*, ¶¶ 69–70].

2. Procedural History of the Two Putative Class Actions

To understand the pleading defect caused by the dissonance between the class definition in the operative Complaint and the proposed class definitions in the Motion to Certify and Motion to Redefine the Class, it is first necessary to understand certain information regarding the progression of this case and a similar case as well as the evidence used to support each.[16]

On December 6, 2019, two separate putative class actions were filed: (1) the instant case, in which Plaintiff Sommerville sought to represent a class of persons who have resided within three census tracts in and around the South Charleston Plant in South Charleston, West Virginia since 1978, *see* [ECF No. 1], and (2) *Letart v. Union Carbide Corporation et al.*, Civil Action No. 2:19-cv-877, in which a different Plaintiff, Mark Letart, sought to represent a putative class of persons who have resided within eleven census tracts in and around the Institute Plant in Institute, West Virginia since 1981, *see* [*Letart v. Union Carbide Corporation et al.*, Civil Action No. 2:19-cv-877, ECF No. 1]. The two cases proceeded separately. The two cases each "dealt with [allegations regarding] . . . different facilities several miles apart; involved distinct evidence relating to the operation of the two different facilities[,] including emission rates; were brought by two different putative class representatives (with different underlying medical histories and exposure histories) seeking to represent two different classes; and involved different defendants."

[16] The court "may properly take judicial notice of matters of public record." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (citing Fed. R. Evid. 201(b)) (stating, in relevant part, that a "court may judicially notice a fact that is not subject to reasonable dispute because it" "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Colonial Penn. Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("The most frequent use of judicial notice . . . is in noticing the content of court records.") (citation modified); *McNulty v. Casero*, 479 F. Supp. 3d 200, 224 n.4 (D. Md. 2020) ("At the summary judgment stage, the Court may consider matters over which it may take judicial notice.") (citation omitted). As a matter of public record, the court takes judicial notice of *Letart v. Union Carbide Corporation et al.*, Civil Action No. 2:19-cv-877.

[ECF No. 509, at 3]. Notably, Defendant "Covestro . . . is a defendant in the instant *Sommerville* matter, but it was never a party to the *Letart* matter." [ECF No. 510, at 2].

According to Defendants, in March 2023, Plaintiffs' counsel indicated to Defendants' counsel their intention "to move to consolidate the *Letart* & *Sommerville* complaints and amend the class definition in accordance with the evidence from" the experts. [ECF No. 510, at 2 (emphasis added); ECF No. 509, at 4].[17]

For context, Dr. Sahu prepared a nearly identical expert report for this case and *Letart* regarding emissions air dispersion modeling, including "the path [and] air concentrations" of the EtO emissions from both the South Charleston and Institute Plants and their impacts on surrounding communities. [ECF No. 494, at 3; *Sahu Expert Report*, at 6, 14, 17, 68 ("Sources of EtO at the South Charleston and Institute facilities . . . were modeled . . . to determine concentration impacts in the surrounding communities."); 71 ("The AERMOD model was run for all emission sources at the South Charleston and Institute facilities for each year between 1984 and 2019[.]"); 75 ("The two residential locations . . . [of Plaintiff Sommerville and Mark Letart, the named plaintiff in *Letart v. Union Carbide Corporation et al.*, Civil Action No. 2:19-cv-877], are within one kilometer of the two facilities[.]")].

Dr. Wells also prepared identical reports for both cases calculating putative class members' increased relative risk of developing cancer, which he based on Dr. Sahu's cumulative exposure calculations, which were, in turn, based on emissions from both the South Charlston and Institute facilities. [ECF No. 509, at 4 (The "nearly identical expert reports in *Letart* and *Sommerville* . . . lumped together alleged emissions from both Institute and South Charleston, despite the fact that

[17] I note the parties conferred between March 10 and March 17, 2023 regarding their respective concerns and the potential logistics of procedural consolidation of the two cases pursuant to Rule 42(a) or amendment of the respective complaints under Rule 15(a)(2). [ECF 510-1, at 2–8].

the *Letart* complaint contained no allegations about South Charleston, and the *Sommerville* complaint contains no allegations about Institute."); *see generally Wells Expert Report*; *Sahu Expert Report*].[18]

According to Defendant Covestro, between March 2023 and June 2023, it appeared Plaintiffs' counsel had "dropped the [consolidation] issue after Covestro objected . . . due to the prejudice of forcing Covestro into a case it *has never been a party to*, against a plaintiff *it has never been a party against*, and concerning a facility that *has never been relevant to this action*." [ECF No. 510, at 2]. In June 2023, however, plaintiffs in each case filed respective motions to redefine the class to encompass all fourteen census tracts identified in both cases, [ECF No. 307; *Letart v. Union Carbide Corporation et al.*, Civil Action No. 2:19-cv-877, ECF No. 287], in an attempt to "create an omnibus amended class definition that is virtually identical for the two cases." [ECF No. 509, at 5].

At that time, I did not resolve either motion to redefine in either case. On September 19, 2023, the parties in *Letart* dismissed the case with prejudice pursuant to Rule 41(a)(1). [*Letart v. Union Carbide Corporation et al.*, Civil Action No. 2:19-cv-877, ECF No. 335]. Whereas in this case, I did not reach the issue because I excluded Dr. Sahu's expert opinion and testimony as unreliable, [ECF No. 410], and concluded Plaintiff Sommerville lacked standing and that her medical monitoring claim was not ripe. *See* [ECF No. 411].

Following reopening on remand, I set a deadline of July 20, 2026, for "[a]ny party wishing to pursue a motion denied without prejudice [to] refile that motion." [ECF 427]. Following a

[18] *See* [ECF No. 509, at 4 ("Letart and Sommerville's shared expert Dr. Sahu purported to calculate the cumulative exposure of both plaintiffs by combining emissions from Institute and South Charleston. Their shared expert Dr. Wells then took Dr. Sahu's exposure estimates and plugged them into his regulatory-style risk model; thus, Dr. Wells purports to estimate the increased risk of Letart and Sommerville caused by emissions from Institute and South Charleston.")].

request for clarification from Plaintiff Sommerville, I clarified the refiled motions need not "be identical in every respect to the versions previously filed . . . [and] the parties may revise or supplement them, as appropriate[.]" [ECF Nos. 428; 429]. Plaintiff Sommerville nevertheless did not refile her previously filed Motion to Redefine the Class. *See* [ECF No. 307]. When Defendant Union Carbide noted Plaintiff Sommerville's failure to do so in response to Plaintiff Sommerville's supplemental memorandum, [ECF No. 470, at 3], Plaintiff Sommerville then filed her Motion to Redefine the Class on September 4, 2026. [ECF No. 493].

3. Motion to Redefine the Class

The class definitions contained in the Motion to Certify, [ECF Nos. 313; 314], and Motion to Redefine the Class, [ECF No. 493], are nearly identical—aside from the beginning date of the class period. *Compare* [ECF No. 314, at 2 (containing date originally associated with the *Letart* case—1981); *with* ECF 493, at 3 (containing date stated in the operative Complaint in this case—1978)]. Both contain reference to the three original census tracts identified in the operative Complaint as well as the eleven census tracts that were the focus of *Letart*. However, both class definitions depart substantially from the proposed class set forth in the operative Complaint. *Compare* [ECF No. 314, at 2; *and* ECF 493, at 3; *with Second Amended Complaint*, ¶¶ 69–70].

Plaintiff asserts this is the result of newly discovered information during discovery, including Dr. Sahu's analysis regarding the "geographic reach of any meaningful airborne concentrations," Dr. Stayner's opinion that a "1 in 100,000 increase in cancer risk is a significantly increased risk, and Dr. Knopf['s opinion] . . . that . . . a 1 in 10,000 increase in cancer risk justified his proposed medical monitoring program." [ECF No. 494 at 5–6 (citing [ECF No. 493-1–2])]. Plaintiff asserts in light of the expert testimony, "a modification to the Class definition is warranted to include additional census tracts affected by Defendants' emissions of EtO (specifically,

54039013200, 54039010200, 54039013600, 54039013300, 54039010600, 54039010701, 54039010500, 54039010400, 54039010300, 54039013400, and 54039013500) . . . while narrowing the Original Definition to only include those who reach a threshold level of increased risk of 1 in 10,000." *Id.* Plaintiff "therefore seeks to redefine the class to . . . make the proposed definition comport with the geographic reach of the EtO emissions by Defendants as supported by evidence" of Defendants' emissions "in and around Defendants' manufacturing facilities in Institute, West Virginia (the 'Institute Plant') and South Charleston, West Virginia (the 'South Charleston Plant')." *Id.* at 2.

Defendants point out the motion represents an unauthorized attempt to circumvent this Court's deadlines and Federal Rules of Civil Procedure 42(a) and 15(a)(2). Defendants assert that by adding the additional eleven *Letart* census tracts to the class definition, Plaintiff effectively attains consolidation of this case with the previously dismissed *Letart* case and benefits as if she moved to amend the operative Complaint without doing so.[19] *See* [ECF Nos. 509; 510].

---

19 Covestro also argues that to grant the motion to redefine the class would be prejudicial to its *Daubert* motions. [ECF No. 510, at 1]. Covestro does not explain how this would be so. Indeed, Covestro makes the same argument about the unpled Institute emissions in a number of its *Daubert* motions. *See* [ECF Nos. 435, at 2 (arguing Dr. Cowan's opinions regarding the Institute facility are "not relevant"); 441, at 2 (citing [ECF No. 85, ¶¶ 1, 3, 4]) ("[T]he only input for Dr. Wells's relative-risk calculations is a 'cumulative exposure' figure generated by Plaintiff's air modeling expert Dr. Sahu[, which] combine[s] emissions from two separate facilities – South Charleston and Institute – while Plaintiff's allegations in this case concern only South Charleston. . . . Dr. Wells's risk estimate thus reflects exposure from a source Plaintiff does not allege caused her harm"); 443, at 1, 4–9 (arguing Dr. Sahu's model does not "fit" the facts of the case because it "combines emissions from South Charleston and the Institute Facility without separating their respective contributions to modeled exposure"); 449, at 1, 11–12 (arguing "Dr. Wells's calculations are irrelevant as to Covestro. . . because he combines emissions from Union Carbide Corporation's Institute and South Charleston operations with Covestro's South Charleston operations[, and] Covestro cannot be held liable for emissions by another defendant, let alone by another entity at another, irrelevant facility"); 455, at 11–12 ("Plaintiff . . . alleges exposure to emissions from South Charleston *only*. . . . Her allegations have nothing to do with Institute. But the 'cumulative exposure' figure that Dr. Sahu offers for outside Ms. Sommerville's home includes impacts 'from Institute' that range from '3% to 76%' of the total for any given year") (citations omitted)].

Additionally, Union Carbide argues the fact that "*Letart* has been dismissed *with prejudice*" precludes the modification because the "claims . . . on behalf of [the *Letart*] proposed class cannot now be re-litigated . . . and Plaintiff's counsel cannot get around that bar by sneaking it into Plaintiff Sommerville's case through this Motion." [ECF No. 509, at 9]. In light of the Court's denial of class certification, the Court need not resolve this argument.

In reply, Plaintiff asserts she does not seek consolidation, "does not seek to amend the [operative C]omplaint," [ECF No. 494, at 12], and does not "seek[] to assert new legal claims and novel theories of liability through her motion to redefine the class." [ECF No. 511, at 9–11, 14–17]. Rather, she seeks "to redefine the Class to conform to the evidence—that Defendants' emissions cover a larger geographic scope (*and are sourced from two facilities*—its Institute and South Charleston facilities)[.]" *Id.* at 9 (emphasis added).

The Fourth Circuit has acknowledged "district courts have discretion in their phrasing" of class definitions. *Stafford*, 123 F.4th at 682. District courts may permit a party to amend its class definition prior to a class certification ruling or can modify a proposed definition *sua sponte* when considering a motion for class certification. *Id.* ("An appropriate class definition should provide proper detail to identify whether or not a prospective class member was injured and whether their claim coheres with the rest of the certified class. There is no brightline rule for how such a definition should read[.]").

Additionally, some courts have analyzed whether to allow modification of class definitions by the standard contained in Rule 15. Fed. R. Civ. P. 15(a)(2) ("The court should freely give [a party] leave [to amend its pleading] when justice so requires."); *CSS, Inc. v. Herrington*, 318 F.R.D. 582, 584–85 (S.D.W. Va. 2016) (Goodwin, J.) (quoting *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006)) ("The Fourth Circuit has interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'"); *but see Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008) (after the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied

to justify leave to amend the pleadings); *Montgomery v. Anne Arundel County,* 182 F. App'x. 156, 162 (4th Cir. May 3, 2006).[20]

Regardless of which standard applies, a party cannot raise a new claim or theory through argument. The only way to raise new claims or legal theories after discovery has begun is by amending the operative complaint. *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citing *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009)) ("[I]t is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint."); *see also vonRosenberg v. Lawrence*, 849 F.3d 163, 166 n.1 (4th Cir. 2017) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy.").

Here, both of the revised proposed definitions, *see* [ECF Nos. 314; 493], reflect expert discovery revelations indicating that regional ambient EtO concentrations are impacted by cumulative, multi-facility emissions originating from both the South Charleston and Institute facilities. *See generally* [*Sahu Expert Report*]. Defendants are correct that this case focuses on "an alleged risk posed by alleged emissions from the South Charleston facility only. . . .This case has never been about the Institute facility; that was the separate *Letart* matter." [ECF No. 510, at 6 (citing [*Second Amended Complaint*, at ¶¶ 1, 3–9, 19, 28, 29, 34, 40–46, 49–52, 54, 57, 58, 75, 87, 88, 94–98, 101, 105]); *see also* 509, at 1–4, 15, 17]. And Plaintiff has not moved under Federal Rule of Civil Procedure 15 to amend the substantive factual allegations in the operative Complaint,

---

[20] *See Harris v. Rainey*, 299 F.R.D. 486, 495 (W.D. Va. 2014) ("Plaintiffs' motion to amend the class definition is functionally a motion to amend Section V of their Complaint."). *See also Weisfeld v. Sun Chem. Corp.*, 84 F. App'x. 257, 259 (3d Cir. 2004) ("Despite failing to revise his complaint, [the plaintiff] sought to narrow the definition of the class in his motion for class certification . . . The District Court considered this revised class definition in its analysis, and we will do the same.") (citation omitted); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (permitting the plaintiff to narrow the proposed class definition when considering a motion for class certification); *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("A district court is not bound by the class definition proposed in the complaint[.]") (citation modified).

which anchors its liability theories strictly to tortious releases originating only from the South Charleston Plant. *See generally* [*Second Amended Complaint*]; *see also Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, (4th Cir. 2013) (exercising pendent appellate jurisdiction to review the district court's denial of a motion for leave to amend class action complaint that was "inextricably intertwined" with its denial of class certification); *Elegant Massage, LLC v. State Farm Mut. Auto Ins. Co.*, 95 F.4th 181, 187–89 (4th Cir. 2024).

Despite the fact that the operative Complaint roots the claims in this case firmly and exclusively to the emissions from the South Charleston Facility, Plaintiff admits she does not seek to amend the operative Complaint. [ECF No. 494, at 12]. She also falsely claims to not "assert new legal claims and novel theories of liability" while simultaneously acknowledging she seeks "to redefine the Class to . . . [reflect] that Defendants' emissions . . . *are sourced from two facilities*—its Institute and South Charleston facilities)[.]" [ECF No. 511, at 9, 12–13, 17; ECF No. 494, at 2 (seeking redefinition "to . . . make the proposed definition comport with the geographic reach of the EtO emissions by Defendants['] . . . Institute Plant . . . and . . . South Charleston Plant")].

Plaintiffs' representation that she does not now seek to assert new legal claims and novel theories of liability is blatantly false. The proposed class definition containing the eleven census tracts relevant to the *Letart* litigation—in addition to the three census tracts relevant to this litigation—effectively achieves consolidation of the two cases and would functionally operate as if Plaintiff Sommerville had amended her Complaint to encompass emissions from the Institute Plant.

I must reiterate this case was never about the Institute Plant. The Institute Plant is not mentioned once in the operative Second Amended Complaint, which refers only to the South Charleston Plant. *See generally* [*Second Amended Complaint*, ¶¶ 1, 4, 7–9, 12–13, 15–16, 18–19,

21, 23, 28–29, 34, 40–46, 49–52, 54, 57–58, 75, 87–88, 94, 98, 101, 105]. This case could only encompass emissions from the Institute Plant if Plaintiffs amend the operative Complaint. They have not done so and are not now asking to.

According to Defendant Union Carbide, Plaintiffs knew, or in the exercise of reasonable diligence would have known, that they wanted to combine this case with *Letart v. Union Carbide Corporation et al*, Civil Action No. 2:19-cv-877, or combine the class definitions to craft the proposed class definition, no later than February 2022 near when Plaintiffs would have received Dr. Sahu's expert report, yet Plaintiffs first filed the Motion to Redefine the Class pleaded in the Second Amended Complaint in June 2023, well over a year later. *See* [ECF No. 509, at 10–11].

I specifically identified for Plaintiffs in March 2024—in the context of the relevance of Dr. Sahu's expert testimony—that he failed to "disaggregate the emissions sources and resulting exposure estimates" such that the "model consists of combined emissions sources from operations at both Institute *and* South Charleston." *See* [ECF No. 410, at 13-14]. Plaintiff Sommerville's then-representations contradict her present arguments. Plaintiff admitted Dr. Sahu's model improperly presented combined results from both Institute and South Charleston, but stated the model is "entirely capable of predicting, at each desired receptor, the impacts from not just one plant but from specific sources within each plant." *Id.* (quoting ECF No. 342, at 9 (quoting [ECF No. 327-13, at 17]; *see also* ECF No. 442-3 ("*Sahu Rebuttal Report*")). Now Plaintiff Sommerville represents the class should be redefined to account for emissions from both facilities. [ECF Nos. 494, at 2; 511, at 9, 12–13, 17]. I identified the defect in March 2024, but Plaintiffs did not disaggregate the data or seek to amend Dr. Sahu's cumulative exposure conclusions contained in his expert report upon which Dr. Wells' relative risk calculations are based.

A plaintiff may redefine a class to better describe the parameters of those who were legally injured, but in doing so, a plaintiff may not include a new theory of liability or expand the scope of wrongful conduct against the defendants. Redefining a class focuses on putative class members not on defendants' conduct. Nor can a plaintiff change their theory of liability under the guise of seeking to redefine a class. Redefining a class is not the same as making new claim.

Even more perplexing, Plaintiff argues "Defendants do not argue that Plaintiff's theory of liability has changed due to the proposed redefinition of the class or that redefinition would lead to additional unalleged claims being litigated." [ECF No. 511, at 17].

But that is precisely Defendants' argument. *See* [ECF No. 510, at 6 ("[T]his case concerns claims [relating to] emissions from the South Charleston facility only.")]; [ECF No. 509, at 1, (stating this case "has always been about emissions from the South Charleston Facility"), 2, 7, 9, 17 ("Even if the Court grants the Motion [to Redefine] and the class definition now includes eleven Institute-area census tracts, the operative pleading still contains no factual allegations regarding Institute emissions. The new class members would enter a case that alleges no facts supporting their claims.")].

That was also Defendant Covestro's position regarding amendment in March 2023 when Plaintiffs' counsel notified Defendants of their intentions. *See* [ECF No. 510-1, at 2 ("[T]o clarify and prevent any misunderstanding, our concern . . . was that it appeared your efforts to consolidate [or amend] would result in Covestro defending new allegations from new Plaintiffs relating to risks at least partly created by emissions from a facility that had never been a part of [this] case . . . [and] that the claims against Covestro [would] include new Plaintiffs and a separate facility, [which] . . . would create significant prejudice[.]")].

I decline to *sua sponte* amend the class definition. *Stafford*, 123 F.4th at 682. Even under the Rule 15(a)(2) standard, justice would not be served by modifying the class definition. Fed. R. Civ. P. 15(a)(2). Defendant Covestro would be prejudiced by the amendment. *CSS, Inc.*, 318 F.R.D. at 584–85; *see also* [ECF Nos. 510; 510-1]. Likewise, Plaintiffs have exhibited bad faith through their: (1) delay in refiling the Motion to Redefine, (2) representations that they do not "assert new legal claims and novel theories of liability" while simultaneously seeking redefinition "to . . . [reflect] that Defendants' emissions . . . are sourced from two facilities" rather than merely the South Charleston Plant, and (3) by previously admitting Dr. Sahu's model improperly presented combined results from both Institute and South Charleston but now continuing to seek a redefined class as a result of "newly developed evidence." [ECF Nos. 494, at 4; 511]. *See United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 198 (4th Cir. 2022) (quoting *Bad Faith, Black's Law Dictionary* (8th ed. 2004)) ("Black's Law Dictionary defines 'bad faith' as '[d]ishonesty of belief or purpose.' . . . To act with a dishonesty of purpose is to act for the wrong reasons. It may be outright lying, deceiving, playing unjustifiable hardball, slacking off, intentionally causing confusion, or stubbornly refusing to follow rules . . . or it might be something as mundane as noticing someone's mistake and saying nothing about it."); *id.* at 200 ("misleading and inconsistent assertions sometimes reveal bad faith").

Additionally, Plaintiffs have not satisfied the good cause standard. *See Parvizian*, 535 F.3d at 298 ("[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend[.]"); *Montgomery*, 182 F. App'x. at 162 (stating that when analyzing good cause, "the primary consideration is the diligence of the moving party").

But Rule 23 is purely a procedural vehicle. It does not, standing alone, serve to amend an operative pleading. *See Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009).

Nor can I *sua sponte* amend the operative Complaint for Plaintiff. A class definition simply cannot outrun the substantive allegations set forth in the complaint. *See Bluegrass, LLC v. State Auto. Mut. Ins. Co.*, 519 F. Supp. 3d 293, 297 (S.D. W. Va. 2021) (Goodwin, J.) ("[A]lthough the [c]ourt is permitted to look outside the complaint for purposes of class certification, the pleadings themselves are important for determining the scope of the proposed class and whether certification is appropriate."); *U.S. ex rel. Owens*, 612 F.3d at 731 (citing *Wahi*, 562 F.3d at 617) ("[I]t is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint."); *see also vonRosenberg*, 849 F.3d at 166 n.1 (same).

This case is limited by the operative Second Amended Complaint *solely* to emissions from the South Charleston facility. *See Sommerville*, 149 F.4th at 414 ("[This] lawsuit concerns a plant in South Charleston, West Virginia . . . which Union Carbide, and then [also] Covestro, operated between 1978 and 2019."). "While many courts have held that it is inappropriate to constrain the parties to the class definition propounded in the plaintiff's pleadings, a Plaintiff may not proffer, after the close of discovery, class definitions that are radically different from what was pled in the complaint." *Scroggins v. Lexisnexis Risk Sols. Fl Inc.*, No. 3:22-cv-545, 2025 WL 3216323, at *22 (E.D. Va. Mar. 30, 2025) (citation modified). Thus, evidence regarding emissions from an unpled facility cannot serve as an independent basis to establish liability or class-wide impact under Rule 23.[21]

[21] Plaintiff Sommerville has made clear she "does not seek to amend the [operative C]omplaint," [ECF No. 494, at 12], but even if she did seek to amend to include allegations regarding the Institute Plant, I would deny the request. The deadline to amend pleadings was originally September 8, 2020, [ECF No. 56], but I extended the deadline to January 15, 2021. [ECF No. 66]. Plaintiffs could have attempted to amend the operative Complaint when they received Dr. Sahu's expert report, or in March 2023, when the parties conferred by email regarding consolidation or amendment, *see* [ECF No. 510-1], or even in July 2026 following reopening on remand. Plaintiff Sommerville did not do so. Plaintiff Sommerville's failure to do so at any time before now and the repeated representations that she does not seek amendment preclude a finding of diligence or good cause. *See Talley v. Folwell*, 133 F.4th 289, 305 (4th Cir.), *cert. denied*, 146 S. Ct. 609, 223 L. Ed. 2d 227 (2025) ("The district court entered a scheduling order, which it is allowed to enforce."); *Eichin v. Ethicon Endo-Surgery, LLC*, 173 F.4th 124, 127 (4th Cir. 2026) ("[A] finding of good cause under Rule 16 depends on the diligence of the party seeking amendment[.]").

I may have concluded differently had Plaintiffs sought modification of the class definition because, for example, Dr. Sahu's modeling—appropriately filtered to account for solely the emissions of the South Charleston Plant—reflected a greater geographic reach and included additional census tracts than initially suspected that are affected by the South Charleston Plant's emissions. Instead, Plaintiffs proceed in seeking class certification of a proposed class that attempts to sneak in unpled conduct regarding the Institute facility and the effect of its emissions. Plaintiffs have not sought leave to amend the Complaint. This case has been pending for nearly six years. The motion for class certification has been pending for over three years. The Plaintiffs have never, in all that time, attempted to amend the Complaint. That fact is decisive. I cannot redefine—let alone certify—a proposed class definition that includes reference to unpled conduct—i.e., the eleven census tracts from *Letart*, [ECF Nos. 313; 314; 493; 494]. For the foregoing reasons, Plaintiff's Motion to Redefine the Class, [**ECF No. 493**], is **DENIED**.

It would be unfairly prejudicial to permit Plaintiff to support this case with evidence concerning unpled conduct (i.e., the Institute Plant or its emissions), but the parties have fully briefed whether the class definition contained within the Motion to Certify meets the requirements of Rule 23. *See* [ECF Nos. 313; 314; 358–59; 375–76; 432; 470–71; 502–503]. The requested modified class definition differs only in the date the putative class period begins, [ECF No. 493], and as I acknowledged previously, either date—1978 or 1981—would be an equally inappropriate date for the beginning of the class period because Dr. Sahu's analysis begins in 1984. [*Sahu Expert Report*, at 6].

Even though Plaintiff Sommerville's proposed class definition includes reference to the eleven census tracts associated with the *Letart* litigation, I nevertheless consider whether the proposed class definition contained within the Motion to Certify [ECF Nos. 313; 314] meets the

certification requirements of Rule 23. Critically, the above identified pleading defect is not the only obstacle to certification. As explained below, even if Plaintiff was permitted to amend the operative Complaint to encompass emissions from both facilities or otherwise cure the defects in the class definitions, the proposed class nevertheless cannot be certified as a single, undifferentiated cohort spanning from either 1978, 1981, or 1984 to the present. Both the proposed classes contained within the Motion to Certify and the Motion to Redefine the Class are impermissible fail-safe classes and further fail to satisfy Rule 23's ascertainability, typicality, predominance, and superiority requirements.[22]

**B. Class Certification**

Having addressed the scope of the proposed class relative to the operative pleading, I now turn to whether the proposed class definition satisfies the implicit and explicit requirements of Rule 23. "Rule 23 holds plaintiffs to a higher bar than a pleading standard." *Stafford*, 123 F.4th at 679. Rather, a "rigorous" analysis is required under Supreme Court precedent. *See Wal–Mart Stores, Inc.*, 564 U.S. at 351. In this case, proof of ascertainability, typicality, predominance, and superiority necessarily overlap with the merits question regarding medical monitoring. *See id.* at

[22] I do not analyze whether Plaintiff Sommerville's original class definition contained in her operative Complaint satisfies the requirements of Rule 23. [*Second Amended Complaint*, ¶¶ 69–70 ("All natural persons who have resided within census tracts 54039000100, 54039012900, 54039000200 (the 'class zone') for a period of one year or more, at any point between January 1, 1978 and the date of this complaint (the 'class period.')")]. Nor do I analyze whether particular issues or subclasses would be appropriate under Rule 23(c)(4) or 23(c)(5), which Plaintiff Sommerville mentions for the first time in the last sentence of her supplemental reply briefs. *See* [ECF Nos. 502, at 13; 503, at 26]. Because Plaintiff Sommerville has not sought certification of the original class definition contained within the operative Complaint, I do not analyze whether the class definition complies with Rule 23. Plaintiff Sommerville likewise mentions Rule 23(c)(4) and 23(c)(5) only in passing without any argument regarding whether and why certification under those provisions would be appropriate. At bottom, Plaintiff Sommerville bears the burden of proposing a class structure that satisfies the requirements of Rule 23, which she has not done. *See Mr. Dee's Inc.*, 127 F.4th at 931 ("[I]t is the burden of the party seeking class certification, not the district court's, 'to demonstrate compliance with Rule 23.'" (quoting *EQT Prod. Co.*, 764 F.3d at 358)); *Lienhart*, 255 F.3d at 146 (citation omitted) ("The party seeking class certification bears the burden of proof."); *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 700 (4th Cir. 2011); *accord G.T.*, 117 F.4th at 202 (quoting *EQT Prod. Co*, 764 F.3d at 357) ("Merely pleading compliance with these requirements is not enough; rather, 'the party [seeking certification] must present *evidence* that the putative class complies with Rule 23.'") (emphasis added); *Stafford*, 123 F.4th at 679.

352. I nevertheless remain mindful of the Fourth Circuit's admonition that Rule 23 should be accorded a liberal construction "which will in the particular case 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *Gunnells*, 348 F.3d at 424 (quoting *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989)).

At the outset, I note that the parties vigorously dispute the expert proof relied upon by Plaintiff to support the proposed class. Assuming for the purpose of class certification the expert opinions satisfy the admissibility threshold of Rule 702 and *Daubert*, I turn to whether Plaintiffs have met their burden for class certification under Federal Rule of Civil Procedure 23. I must now conduct a "rigorous analysis" to determine whether this evidence satisfies the implicit and explicit requirements of Rule 23(a) as well as the requirements of 23(b)(3).

As framed, Plaintiff's proposed class amounts to a "fail-safe" class, fails to satisfy the implicit requirement of ascertainability, and fails to satisfy typicality—an explicit requirement of Rule 23(a)(3)—and Rule 23(b)(3)'s predominance and superiority requirements. Because these defects each independently mandate the denial of class certification, I limit my analysis to these five dispositive analyses.

Plaintiff's Motion to Certify Class, [**ECF No. 313**], is **DENIED** for the reasons set forth below.

1. Fail-Safe Class

"A 'fail-safe' class is 'defined so that whether a person qualifies as a member depends on whether the person has a valid claim.'" *Mr. Dee's Inc.*, 127 F.4th at 930–31 (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 825 (7th Cir. 2012)).

The Fourth Circuit has "not expressly recognized an independent prohibition against fail-safe classes." *Id.* at 931. Other circuit courts to address the issue are divided on whether a proposed

class definition that would result in a fail-safe class constitutes an independent basis for denying class certification. The United States Court of Appeals for the Fifth Circuit has explicitly rejected that a fail-safe class can serve as an independent basis for denial of class certification. *See In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012). Whereas five circuit courts have acknowledged fail-safe classes are impermissible.[23] The United States Court of Appeals for the D.C. Circuit has outlined a more even-handed approach. The court acknowledged the valid concerns associated with fail-safe classes, but rejected an outright prohibition of fail-safe classes. *See In re White*, 64 F.4th 302, 313 (D.C. Cir. 2023). In doing so, the court encouraged district courts to "stick to Rule 23's specified requirements when making class certification decisions" to either pinpoint concerns within the contours of Rule 23 or to assuage "any 'fail-safe' concerns" without "deploying a textually untethered and potentially disuniform criterion, the contours of which can vary from case to case." *Id.* The concerns often associated with fail-safe class definitions are relevant here:

> Courts have identified two main problems with certifying a so-called 'fail-safe' class, the membership of which depends on the merits. First, if membership in a class depends on a final resolution of the merits, [ascertainability is lacking since] it is [too] administratively difficult to determine class membership early on. *See Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 492–497 (7th Cir. 2012)). Second, if the only members of fail-safe classes are those who have viable claims on the merits, then class members either win or, by virtue of losing, are defined out of the class, escaping the bars of res judicata and collateral estoppel." *See* [*Young v.*

[23] *See, e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015) (It would be "inappropriate" to certify "a 'fail-safe class'—a class defined in terms of the legal injury."); *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (A fail-safe class "is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those class members win or, by virtue of losing, they are not in the class and are not bound.") (citation modified); *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 799 (7th Cir. 2017) ("A case can't proceed as a class action if the plaintiff seeks to represent a so-called fail-safe class—that is, a class that 'is defined so that whether a person qualifies as a member depends on whether the person has a valid claim.' . . . A fail-safe class is impermissible[.]") (citation modified); *Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 624 (8th Cir. 2021) (concluding a fail-safe class, "a class in which membership depends upon having a valid claim on the merits," is "impermissible because [(1)] it allows putative class members to seek a remedy but not be bound by an adverse judgment[,] . . . [and (2) it results in predominance and superiority concerns since the class becomes]" "unmanageable . . . because the court cannot know to whom notice should be sent"); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) ("A court may not, however, create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct. . . . But, ultimately, the problem of a potentially 'over-inclusive' class can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.") (citation modified).

> *Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)]. Heads they win; tails the defendant lose[s]—at least, that is the concern.
>
> To illustrate, for a class definition that encompasses "all those whom Company X defrauded," the "defrauded" addendum makes the definition circular. That is, whether or not certain actions constitute fraud, a tortious activity for which Company X would be subject to liability, is just what the litigation is meant to find out. As for res judicata effect, if a defendant is found not to have defrauded anyone, then there would be no class members at all. Every erstwhile class member would, after the merits determination, become a stranger to the case who would not be bound by that litigation loss.

*Id.*

Plaintiff's proposed class definition contains two distinct components. Part (a) defines the class geographically and temporally: persons who resided within fourteen specified census tracts at any point between January 1, 1981 and the date of certification. Part (b) adds a substantive threshold: those who, by virtue of their cumulative exposure to EtO, have at least a one-in-10,000 increased risk of lymphoma, leukemia, and multiple myeloma. *See* [ECF No. 314, at 1–2].

Under West Virginia law, Plaintiff must prove, in relevant part, the following essential substantive element of a *Bower* medical monitoring claim: "as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease." *See Bower*, 522 S.E.2d at 431–33. By defining class inclusion in Part (b) as having "by virtue of their cumulative exposure to EtO . . . at least a one-in-10,000 increased risk of lymphoma, leukemia, and multiple myeloma," Plaintiff ties class inclusion to the ultimate resolution of a contested merits issue. [ECF No. 314 at 2].

If a jury ultimately concludes that a "one-in-10,000 increased risk" does not constitute a legally actionable "increased risk" under *Bower*, that exposure to EtO does not increase the risk of getting one of the named cancers, or that any given class member's increased risk is not a proximate result of the exposure, those exposed individuals would be defined out of the class after

the fact, escaping the binding effect of an adverse judgment. *See Mr. Dee's Inc.*, 127 F.4th at 930–31; *In re White*, 64 F.4th at 313.

Plaintiff responds that the "proposed Class is defined by reference to (1) census tract; (2) address; and (3) duration of residency." [ECF No. 376, at 10]. That characterization is incomplete because it ignores Part (b). This presents Plaintiffs with an inescapable dilemma. If Plaintiffs position is that every person residing within the identified census tracts during the class period necessarily meets the one-in-10,000 increased-risk threshold, then Part (b) is redundant and adds nothing to the class definition. If, on the other hand, Plaintiff contends that some residents within the census tracts would not satisfy that threshold because of differences in address, duration of residence, timing of exposure, or other factors affecting cumulative dose, then determining class membership under Part (b) requires answering a disputed merits question. Accordingly, the proposed class is a fail-safe class, so it fails to conform to the requirements of Rule 23.

2. Threshold Requirement—Ascertainability

Implicit in Federal Rule of Civil Procedure 23 is the requirement that the proposed class be ascertainable. While the text of Rule 23 does not explicitly articulate an ascertainability prerequisite, the Fourth Circuit has long recognized that "[i]n order to determine whether a class action is proper, the district court must determine whether a class exists and if so [who or] what it includes." *Roman v. ESB, Inc.,* 550 F.2d 1343, 1348 (4th Cir. 1976). Accordingly, "the definition of the class is an essential prerequisite to maintaining a class action." *Id.*; *see also Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 284 (S.D. W. Va. 2015) (citing *id.*)

To satisfy this requirement, a plaintiff must demonstrate that class members are "readily identifiable," *Spurlock v. Wexford Health Sources, Inc.*, 175 F.4th 232, 244 (4th Cir. 2026) (quoting *Career Counseling, Inc.*, 91 F.4th at 206), through "objective criteria," *EQT Prod. Co.*,

764 F.3d at 358. Importantly, ascertainability does not demand that the court be "able to identify every class member at the time of certification." *Glover v. EQT Corp.*, 151 F.4th 613, 621 (4th Cir. 2025). Rather, the goal is to identify some "administratively feasible" method by which class membership can later be determined. *Krakauer*, 925 F.3d at 658. But if "a 'court cannot identify class members without extensive and individualized fact-finding or mini-trials,' then the class cannot be certified because class membership cannot be ascertained." *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Krakauer*, 925 F.3d at 658).

As previously acknowledged, Plaintiff's proposed class definition contains two distinct components. Part (a) defines the class geographically and temporally: persons who resided within fourteen specified census tracts at any point between January 1, 1981, and the date of certification. Part (b) adds a substantive threshold: those who, by virtue of their cumulative exposure to EtO, have at least a one-in-10,000 increased risk of lymphoma, leukemia, and multiple myeloma.

I am unpersuaded by Defendants' contention that Part (a) defeats ascertainability. Geographic and temporal criteria are objective baseline parameters that do not require individualized merits determinations. Defendant Union Carbide argues that the class is not ascertainable because "the *actual* membership of the alleged class would require identifying the address (or addresses) of every class member and how long they lived at each address," including "transient class members . . . ." [ECF No. 359, at 21 (emphasis in original)]. Defendant Covestro similarly argues that "Plaintiff 'only identified a universe of potential claimants and substantial additional work is needed to reliably identify the class.'" [ECF No. 358, at 19 (quoting *Parsons v. Columbia Gas*, No. 2:20-cv-00279, 2022 WL 4809492, at *6 (S.D. W. Va. Sept. 30, 2022) (Tinsley, M.J.))]. I disagree.

Rule 23 classes often require later review of objective records, including residential histories, employment records, tax records, and transaction data to identify class members.[24] The need to consult such records does not, by itself, defeat ascertainability. Records associated with residency are plainly objective criteria the court could rely on to identify class members in an administratively feasible manner because reference to the records would result in a straightforward "yes-or-no" answer regarding a class member's duration and location of residency. *Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022) ("[A] straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources.").

Plaintiff further urges the same is true at the second part of the analysis whereas Defendants contend this process would result in "extensive and individualized fact finding or 'mini-trials.'" [ECF Nos. 358, at 18–19; 359, at 17–18 (quoting *EQT Prod. Co.*, 764 F.3d at 358)]. Plaintiff asserts "[t]he level of increased risk for any specific geographic location will be objectively determined by use of the air and risk modeling conducted by experts Drs. Sahu and Wells [by way of t]heir models[,which] calculate [cumulative] exposure, and the increased [relative] risk of diseases based upon the concentrations at any given location over a given period of time." [ECF

[24] *See Krakauer*, 925 F.3d at 658 ("[A] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." (internal quotation marks omitted)); *Ciarciello v. Bioventus Inc*, 760 F. Supp. 3d 377, 391 (M.D.N.C. 2024) ("In securities cases, courts and litigants can often readily identify putative class members by reference to objective data about who bought and sold . . . stock during the class period." (internal quotation marks omitted)); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, (D. Md. 2022); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3rd Cir. 2015) ("[T]he need to review individual files to identify [class] members [is] not [a] reason[ ] to deny class certification."); *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017) ("[A]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." (internal quotation marks omitted)); *Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 692 (N.D. Ga. 2016) ("To the extent class members retained receipts or credit card statements documenting payment . . . these objective records can be used to permit self-identification of class members in a reliable manner."); *In re Flint Water Cases*, 499 F. Supp. 3d 399, 426 (E.D. Mich. 2021) (finding a class ascertainable where definitions were "geographically circumscribed to one city in one state and are based on objective criteria, such as where an individual resided at a particular time or whether they owned or rented property").

No. 314, at 20]. According to Plaintiff "those individual residents who suffer from an increased risk of at least 1 in 10,000 of developing lymphoid cancers as a result of the [c]lass members' exposure to EtO . . . can be objectively determined as a function of residency" using first Dr. Sahu's model to input putative members' residential addresses and their duration of residency, which outputs a level of cumulative exposure "of EtO emitted by Defendants" before "plugging that level of cumulative exposure into Dr. Wells's risk analysis" calculations, resulting in a number representing a putative plaintiff's "increase in relative risk" measured as X in 10,000. *Id.* According to Plaintiff, if the level of increased risk is "at least 1 in 10,000" the individual would be a class member.

Pursuant to *Bower*, the question is whether the Plaintiff (1) has, relative to the general population, been significantly exposed, (2) to a proven hazardous substance, (3) through the tortious conduct of the defendant, (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease, (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure, and (6) monitoring procedures exist that make the early detection of a disease possible. *See Sommerville*, 149 F.4th at 416 (quoting *Bower*, 522 S.E.2d at 432–33). But because class inclusion is tied to the ultimate resolution of a contested merits issue, Part (b) of the proposed definition further presents an ascertainability problem. The court will be unable to determine class members until after a legally cognizable injury has been established. *See Career Counseling, Inc.*, 91 F.4th at 211 (affirming district court's conclusion that plaintiff's class member-identification-method was insufficient to avoid the need to conduct an "individualized inquiry as to whether each recipient was using a stand-alone fax machine at the relevant time, rendering the class of stand-alone fax machine users

'not ascertainable' and class certification 'inappropriate'"). Accordingly, ascertainability is lacking.

3. Rule 23(a)(3): Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff[s'] claims." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980).

As the Supreme Court reiterated in *Wal–Mart Stores, Inc. v. Dukes*, "the commonality and typicality requirements of Rule 23(a) tend to merge." 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 157–58 n.13). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

The Fourth Circuit has emphasized that "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter*, 436 F.3d at 466 (quoting *Broussard*, 155 F.3d at 340). "The representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Id.* at 466. While the claims of the named plaintiffs need not be "perfectly identical" to the claims of the class members, typicality is lacking where "the variation in claims strikes at the heart of the respective causes of actions." *Id.* at 467. Thus, "the appropriate analysis of typicality must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." *Id.*

Applying these principles, I find the named Plaintiff is not typical of the proposed class as a whole because her claim cannot encompass the claims of individuals who resided in the Class Zone before 2000. Plaintiff Sommerville's personal claim arises from alleged EtO exposure during a period in which Covestro and its corporate predecessor operated at the South Charleston Plant. Covestro did not acquire or operate the polyols facility at the South Charleston facility until 2000. [ECF No. 358-1, ¶¶ 4–5 n.1]. Because Plaintiff Sommerville failed to intervene or name a class representative who resided in the Class Zone between 1981 and 1999, she cannot satisfy Rule 23(a)(3) typicality for pre-2000 residents. She lacks personal standing, incentivization, and factual alignment to litigate Union Carbide's standard-alone historical emissions, flaring practices, or corporate liability defense structures. Proving her own post-2000 claim against both Union Carbide and Covestro does nothing to establish or advance liability for Union Carbide's distinct, pre-2000 operational practices.

This distinction is material to typicality and precludes me from determining typicality is satisfied. Individuals who resided in the Class Zone before 2000 would base their claims, at least in part, on alleged exposure to emissions attributable to Union Carbide during that period. Those claims present factual and legal questions concerning Union Carbide's historical emissions, operational practices, and potential liability that are not presented by Plaintiff Sommerville's individual claim. Her prosecution of a claim based on post-2000 exposure therefore would not necessarily advance the interests of persons whose claims depend upon pre-2000 emissions. Because Plaintiff Sommerville has no claim arising from that period, she cannot satisfy Rule 23(a)(3) as a representative of individuals who lived in the Class Zone before 2000.

Nor is Plaintiff Sommerville's claim typical of the proposed minor class members. Plaintiff's own expert, Dr. Knopf, proposes a distinct medical-monitoring protocol for children

that differs from the protocol proposed for adults. [ECF No. 313-9, at 28–30]. The pediatric protocol is tailored to the different medical considerations applicable to children and calls for a more limited, non-invasive screening regimen, including annual medical histories and physical examinations, with diagnostic blood testing reserved for specific clinical indications. *Id.* Plaintiff Sommerville, as an adult, does not share the medical circumstances or proposed monitoring regimen of these minor class members. Her claim for adult medical monitoring therefore does not present the same questions concerning the medical necessity, risks, or appropriate scope of pediatric monitoring. Nor would establishing her entitlement to the adult monitoring protocol establish the entitlement of minor class members to the distinct pediatric protocol.

Accordingly, Plaintiff Sommerville's claims are not typical of the proposed class to the extent the class includes individuals who lived in the Class Zone before 2000 or minor class members. Those differences concern the substance of the claims and the relief sought, rather than merely incidental factual variations.[25] Plaintiff Sommerville therefore cannot satisfy Rule 23(a)(3) typicality as to those members of the proposed class.

4. Rule 23(b)(3) Requirements

Under Rule 23(b)(3), a class may be certified only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) sets forth various factors pertinent to this determination, including:

---

[25] *See Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2018 WL 1546355, at *14 (E.D. Ky. Mar. 29, 2018) (citing *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 915 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014)) (highlighting that where individuals in a putative class can trace their injuries to a single event as opposed to a decades-long one, class action treatment is generally more appropriate as class members are more readily ascertainable, questions common, claims typical, and predominance more easily satisfied).

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

In contrast to mandatory class actions under Rule 23(b)(1) or (b)(2), Rule 23(b)(3) actions are framed for situations where class-wide treatment "may nevertheless be convenient and desirable." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal quotation marks omitted). Because Rule 23(b)(3) classes bind absent plaintiffs seeking monetary or individualized relief, courts must take a "close look" at whether common questions predominate over individual ones. *Id.*at 615–16.

a. Predominance

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016) (quoting *Amchem Products, Inc.*, 521 U.S. at 623). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Id.* An individual question is one where "members of a proposed class will need to present evidence that varies from member to member." *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)). Conversely, a common question resulting in common proof is one where "the same evidence will suffice for each

member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (internal quotation marks omitted).

In evaluating predominance, the court "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal quotation marks omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* at 453–54 (internal quotation marks omitted). Importantly, "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 459, 133 S. Ct. 1184 (2013).

Here, the proposed class is defined to contain only people whose modeled cumulative exposure produces at least a one-in-10,000 increased risk of the specified cancers. [ECF Nos. 313; 314; 493]. According to Plaintiffs, their experts provide common class-wide proof that serve as common answers to *Bower*'s questions. *See* [ECF Nos. 314, at 12–19; 375, at 3–16; 276, at 6–19; 432, at 2–4; 502, at 1–3; 503, at 1–4, 12–16].

To satisfy the predominance inquiry, Plaintiffs must offer evidence capable of commonly proving the elements of a medical monitoring claim for each proposed class member. In evaluating that evidence, I must determine if it has the potential to commonly prove whether: (1) each putative class member has experienced significant exposure; (2) each has experienced a significantly increased risk of disease; and (3) a reasonable doctor considering the exposure and increased risk of each individual would recommend medical monitoring different from what he would have

prescribed absent the exposure. *See Rhodes v. E.I. du Pont de Nemours & Co.*, 253 F.R.D. 365, 374 (S. D. Va. Sept. 30, 2008) (Goodwin, J.).

Plaintiff argues Dr. Sahu's air dispersion model, which, according to Plaintiff, can generate a cumulative exposure calculation for putative class members based on their location and duration of residency, serves as common proof of *Bower*'s significant exposure element as well as the fault element requiring the exposure be the result of a defendant's tortious conduct. [ECF No. 314, at 12–14; 375, at 4–6; 376, at 17–19]. Plaintiff also asserts Dr. Stayner's general causation testimony (that EtO increases the risk of the identified cancers) along with Dr. Wells's calculation model, which enables calculation of putative class members' increased risk of developing those cancers based on Dr. Sahu's calculation of cumulative exposure (i.e., a putative class member's "relative risk") serve as common proof of *Bower*'s increased risk of disease element. [ECF Nos. 314, at 14–17; 375, at 10–13; 376, at 4, 11–13]. Further, Plaintiff asserts Dr. Knopf's testimony that a qualified physician would prescribe a monitoring program to everybody at the risk level identified by Dr. Wells (>one in 10,000) and his proposed monitoring program serve as common evidence of *Bower*'s element requiring a need for periodic monitoring and existing medical procedures to do so. [ECF Nos. 314, at 17–19; 375, at 10–13; 376, at 13–14].[26]

My concern, therefore, under Rule 23 is whether the foregoing can establish a "*prima facie* showing" of each of the *Bower* elements and whether "the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453. Or whether instead there are individual questions

[26] Dr. Cowan identifies the amount of putative class members meeting a certain threshold and opines that a statistically significant relationship exists between cancer incidence and both distance from the center of the plume and cumulative EtO exposure. [*Cowan Rebuttal Report*, at 6]. Based on those analyses, Dr. Cowan concludes that the available data demonstrates a relationship between EtO exposure and cancer incidence in the affected area and does not support the conclusion that no such relationship exists. *Id.* Plaintiffs would likely use Dr. Cowan's expert testimony to serve as common evidence to prove proximate cause and that the exposure was the result of a defendant's tortious conduct. However, Plaintiffs failed to make any such argument in any of the class certification briefing. *See generally* [ECF Nos. 314; 375; 376; 432; 502; 503].

requiring "members of a proposed class . . . to present evidence that varies from member to member." *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)).

The parties rely heavily on *Rhodes v. E.I. du Pont de Nemours & Co.* in their arguments. *See generally* [ECF Nos. 314, at 12–19; 358, at 4–9, 11–13; 359, at 9–15; 503, at 4–6]. In *Rhodes*, I denied class certification of a 23(b)(2) class for lack of cohesion. Here, Plaintiffs seek certification under 23(b)(3), but the analysis in *Rhodes* is still instructive for the present Rule23(b)(3) predominance inquiry, which "is meant to 'test whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wal-Mart Stores, Inc.*, 564 U.S. at 376 (quoting *Amchem Products, Inc.*, 521 U.S. at 623) (citation modified); *Stafford*, 123 F.4th at 679 (quoting *Amchem*, 521 U.S. at 623) ("While commonality serves to ask whether class-wide proceedings are even possible, predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"); *Tyson Foods, Inc.*, 577 U.S. at 453.

In *Rhodes*, I concluded "class certification is inappropriate . . . because the [medical monitoring claim alleged] require[s] individualized inquiries that are not conducive to common treatment . . . . Though the plaintiffs could overcome that obstacle by demonstrating a plausible common method of proving their medical monitoring claim on a class-wide basis, they have not done so." *Id.* I reasoned none of the following could be shown on a class-wide basis—as required by Rule 23: (1) whether class members were significantly exposed relative to the general population; (2) whether class members suffered a significantly increased risk of disease proximately caused by defendants; and (3) whether class members could demonstrate a reasonable necessity to be tested which would not have existed without the significant exposure. *Id.* at 374–

81. Accordingly, I concluded individualized inquiries as to each of the *Bower* elements was required, precluding a finding of cohesion among the class. *Id.* at 380–81.

The case in *Rhodes* involved a single defendant responsible for releasing a harmful substance into a single water district well field. *Id.* at 367. The plaintiffs moved to certify a class of individuals who, for a period of at least one year since November 2, 2005, had been residential water customers in the relevant water district well field. *Id.* In contrast, this putative class seeks certification of a single class spanning over four decades who were allegedly harmed by of multiple defendants' continuous tortious conduct during that time.

i. Individual issues relating to causation, fault-allocation, and damages predominate over the common questions

Where plaintiffs rely on a class-wide methodology or model to establish damages, Rule 23(b)(3) requires that the model measure only those damages attributable to plaintiffs' theory of liability. *Comcast Corp.*, 569 U.S. at 35. Under *Comcast*, a plaintiff's methodology must be capable of measuring damages on a class-wide basis consistent with their underlying substantive cause of action. *Id.* Under West Virginia's several-liability statute,[27] W. Va. Code § 55-7-13c,

[27] Prior to 2015, West Virginia followed a system of joint and several liability under which a plaintiff could recover the full amount of an award from any defendant found jointly liable, regardless of that defendant's percentage of fault. *See Sitzes v. Anchor Motor Freight, Inc.*, 169 W. Va. 698, 289 S.E.2d 679 (1982); *Strahin v. Cleavenger*, 216 W. Va. 175, 603 S.E.2d 197 (2004). The Legislature fundamentally altered that framework in 2015 by repealing the prior joint-and-several-liability provisions and adopting a modified comparative-fault regime. *See Modular Bldg. Consultants of W. Va., Inc. v. Poerio, Inc.*, 235 W. Va. 474, 480–81, 774 S.E.2d 555, 561–62 (2015) (discussing H.B. 2002, effective May 25, 2015); *State ex rel. Chalifoux v. Cramer*, No. 20-0929, 2021 WL 2420196, at *3–4 (W. Va. June 14, 2021) (recognizing that the 2015 amendments abolished joint and several liability and established a modified comparative-fault system). The current framework is codified at W. Va. Code §§ 55-7-13a to -13d. Section 55-7-13a requires the trier of fact to determine the percentage of fault attributable to each person who proximately caused the plaintiff's damages—including defendants, nonparties, and, where applicable, the plaintiff—and provides that the percentages must total 100%. W. Va. Code § 55-7-13a. Section 55-7-13c then generally makes each defendant liable only for the portion of the compensatory damages corresponding to that defendant's percentage of fault. *Id.* § 55-7-13c. The statute preserves joint liability only in the narrow circumstance in which two or more defendants "consciously conspire and deliberately pursue a common plan or design to commit a tortious act or omission." *Id.* § 55-7-13c(b).

liability for compensatory relief[28] is several rather than joint. Each defendant is liable only for the portion of the compensatory damages corresponding to its percentage of fault. *See* W. Va. Code § 55-7-13c(a). The statute requires the trier of fact to allocate fault among the responsible parties in percentages totaling 100 percent. W. Va. Code § 55-7-13a. West Virginia courts, however, have not squarely addressed how this percentage-allocation framework operates when the alleged harm results from cumulative exposure to a substance emitted by multiple sources at different rates and at different times.

Before the Legislature adopted the current several-liability scheme, West Virginia law treated the divisibility of harm as a threshold question of law for the trial court. *Tracy v. Cottrell ex rel. Cottrell*, 206 W. Va. 363, 373–74, 524 S.E.2d 879, 889–98 (1999). If the court determined that the harm was capable of apportionment, the actual allocation of damages was a question of fact for the jury. *Id.* Conversely, where two or more causes combined to produce a single injury that could not be divided on any reasonable basis, each cause being "a substantial factor" in producing the harm, the defendants were jointly and severally liable for the entire injury. *Id.* The 2015 legislation fundamentally altered that framework by making several liability the general rule and requiring percentage-based allocation of fault. *See* W. Va. Code §§ 55-7-13a to -13d. The statute does not expressly address how that allocation is to operate where the alleged harm is scientifically indivisible or where the relative contributions of multiple sources cannot be quantified with precision.

That issue is particularly consequential here because it means that Covestro cannot be held liable for Union Carbide's emissions. To establish entitlement to medical monitoring against

[28] *Bower*, 522 S.E.2d at 432 ("The cost of medical surveillance is a compensable item of damages[.]" (citation modified)); *Perrine v. E.I. du Pont de Nemours & Co.*, 694 S.E.2d 815, 586 (W. Va. 2010) (Workman, J. concurring) ("[W]hen a plaintiff proves the necessary elements of a medical monitoring cause of action, the damages that are awarded are compensatory damages.").

Covestro, Plaintiffs must establish that Covestro's own conduct proximately caused the requisite significant exposure and significantly increased risk. *See Bower*, 522 S.E.2d at 431. Absent an applicable exception to several liability,[29] Covestro therefore cannot be held responsible for harm caused solely by Union Carbide's emissions. Nor can a class member's residence within the proposed Class Zone, standing alone, establish Covestro-specific causation or fault.

Accordingly, the allegations of a common plan do not provide a basis for imposing joint liability. The claims therefore remain subject to West Virginia's general rule of several liability, under which each Defendant's liability must be determined according to its own percentage of fault. That defendant-specific inquiry presents a fundamental predominance problem.

Plaintiffs nevertheless contend that common questions predominate: "As this case involves one toxin, one emission source, one exposure model, common air modeling, and common risk modeling, all essential to evaluating liability, common questions predominate, where a common injury, caused by common conduct, can be recompensed with a common medical monitoring fund." [ECF No. 432, at 7]. Dr. Sahu likewise maintains that his model "is entirely capable of predicting, at each desired receptor, the impacts from not just one plant but from specific sources within each plant," and concludes that "there is no issue about predicting . . . Covestro's impacts .

[29] Section 55-7-13c(h)(3) creates an exception to several-only liability where a defendant's conduct constitutes an "illegal disposal of hazardous waste" under W. Va. Code § 22-18-3 and proximately causes the plaintiff's damages. The cross-referenced definition of "disposal" expressly includes the "emitted into the air" of hazardous waste, and "hazardous waste" includes substances that may cause or significantly contribute to increased mortality or serious illness. W. Va. Code §§ 22-18-3(2), (6). Thus, EtO emissions could potentially constitute a "disposal" of "hazardous waste" if the substance satisfies the statutory definition. But the § 55-7-13c(h)(3) exception applies only to *illegal* disposal. Under § 22-18-16, illegal disposal includes knowingly treating, storing, or disposing of hazardous waste without a required permit or in knowing violation of a material permit condition. Accordingly, emissions conducted pursuant to and in compliance with a valid permit would not appear to constitute "illegal disposal," leaving the defendant subject to several-only liability. Here, Plaintiffs do not dispute that Union Carbide was permitted by statute and regulation to emit EtO during the 2001–2003 and 2005–2019 periods corresponding to the alleged exposures. [*Wells Expert Report*, at 5]. Nor do Plaintiffs dispute that Covestro's South Charleston emissions were "made pursuant to permits issued by the West Virginia Department of Environmental Protection" or that its South Charleston "operations historically were and currently are in compliance with its permitted requirements." [*Unsworn Declaration of Robert Lenahan*, ¶¶ 24–26]; *see also* [*Sahu Deposition*, at 292].

. . separately." [*Sahu Rebuttal Report*, at 17]. But the ability to generate source-specific exposure estimates does not eliminate individualized questions. Rather, it demonstrates precisely *why* the inquiry is individualized. Once the emissions of the two defendants can be distinguished, the court must determine what legal significance Covestro's particular contribution has for each class member.

Rule 23(b)(3) asks whether the common issues are sufficiently important and prevalent to warrant adjudication by representation. *Tyson Foods, Inc.*, 577 U.S. at 453. An individual question exists where class members must present evidence that varies from member to member, while a common question exists where the same evidence will suffice for each member or the issue is susceptible to generalized, class-wide proof. *Id.* Here, the central questions of causation, fault-allocation, and resultant damages cannot be answered with a single class-wide determination because the proposed class encompasses materially different exposure histories, including presumably putative class members' lengths of exposure, the sources through which their alleged exposure occurred, and their unique medical histories. These considerations all reveal individual inquiries that predominate over common questions, precluding the certification of a Rule 23(b)(3) class.

Additionally, because Dr. Sahu's model calculates exposure based on a person's particular duration of residency and duration of exposure occurring during particular periods, the resulting contribution attributable to Covestro will necessarily vary per class member depending on where that person lived and when that person lived there. A class member who lived in the Class Zone during a period when Covestro was not operating the relevant units presents a materially different causation question from a class member who lived there while Covestro was emitting EtO. Likewise, a person who resided in the Class Zone for decades presents a different exposure, fault-

allocation, and resultant damages question (and answer) from someone who lived there for only a few years. These differences are not merely differences in the amount of damages to be calculated, *see* [ECF No. 432, at 4 (asserting "class certification is still appropriate even if there are some individual issues (e.g., damages) that will need to be resolved." (quoting *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 61 (E.D. Va. 2021) (citing *Krakauer*, 925 F.3d at 658))]; rather, they bear directly on whether each Defendants' own conduct was a legally sufficient cause of the particular class member's increased risk in the first place.

The proposed class therefore encompasses several distinct exposure scenarios. A person who resided in the Class Zone only before 2000 may have been exposed solely to Union Carbide's emissions. For such an individual, Covestro could not be assigned any percentage of fault because Covestro's conduct did not contribute to the person's exposure. A person who resided in the Class Zone only after 2000, by contrast, may have been exposed to emissions from both Defendants, requiring consideration of each defendant's contribution during that person's particular period of residence. And a person whose residence spanned the period before and after 2000 may require an assessment of the respective contributions of the two defendants across the entire exposure period. Thus, Covestro's percentage of fault could range from zero for one class member to a substantially greater percentage for another based solely on differences in the timing and location of residence.

Those differences matter because the *Bower* inquiry is not satisfied merely by demonstrating that a class member was exposed to EtO within the Class Zone. Rather, Plaintiffs must establish the exposure was attributable to the defendant at issue and resulted in the requisite increased risk—that is, that a putative class member was "significantly exposed . . . through the tortious conduct of the defendant." *Sommerville*, 149 F.4th at 416 (citation modified) (quoting

*Bower*, 522 S.E.2d at 432–33). As the Supreme Court of Appeals of West Virginia explained in *Bower*:

> Liability for medical monitoring is predicated upon the defendant being *legally responsible* for exposing the plaintiff to a particular hazardous substance. Legal responsibility is established through application of existing theories of tort liability. "Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage *when liability is established* under traditional theories of recovery."

*Bower*, 522 S.E.2d at 433 (first quoting *Potter v. Firestone Tire and Rubber Co.*, 6 Cal.4th 965, 1007, 25 Cal.Rptr.2d 550, 578, 863 P.2d 795, 823 (1993) (en banc); and then quoting *Hansen*, 858 P.2d at 979 ("[T]he plaintiff must prove that the exposure to the toxic substance was caused by the defendant's negligence, i.e., by the breach of a duty owed to the plaintiff[.]")). Accordingly, even assuming Dr. Sahu's model can determine the amount of EtO attributable specifically to Covestro at each class member's residence, the factfinder would still have to determine whether that defendant-specific exposure was sufficient to satisfy *Bower* for that particular individual.

Consider, for example, two individuals who lived within the proposed Class Zone during overlapping periods. Class Member A may have lived near the South Charleston Plant during a period in which Covestro's relevant units generated substantial emissions. Covestro's contribution might therefore constitute a substantial factor in producing that individual's alleged increased risk. Class Member B, however, may have lived farther from the plant or during a period in which Covestro's emissions were minimal. If Union Carbide's substantially greater emissions independently produced the requisite increase in risk, Covestro's smaller contribution might not constitute a legally sufficient cause of Class Member B's risk. Both individuals would satisfy the geographic component of the proposed class definition, yet their claims against Covestro would present fundamentally different causation questions.

Nor does the ability to calculate each defendant's percentage of emissions resolve the problem. A percentage of emissions is not necessarily a percentage of legal fault. The statutory allocation turns on the percentage of fault attributable to each person who proximately caused the plaintiff's damages, not simply on the proportion of the underlying substance emitted by each defendant. *See* W. Va. Code §§ 55-7-13a, -13c. Thus, even assuming Dr. Sahu's model can determine that Covestro contributed, for example, a particular percentage of a putative class member's atmospheric EtO exposure, the factfinder must still determine whether that contribution was a proximate cause of the legally cognizable risk and, if so, what percentage of fault should be assigned to Covestro. *Id.* § 55-7-13c; *see also Sommerville*, 149 F.4th at 416; *Bower*, 522 S.E.2d at 433.

The inquiry becomes even more complicated if Plaintiff's theory is that the cumulative exposure attributable to both Defendants is necessary to produce the requisite increased risk. In that circumstance, the factfinder would have to determine the respective contributions of Union Carbide and Covestro to each class member's cumulative exposure, and then determine whether those contributions, individually or in combination, satisfy the applicable requirements of *Bower*. If both defendants were found to have contributed to the legally cognizable risk, the factfinder would then have to allocate responsibility between them under § 55-7-13c. Those determinations necessarily depend on the particular class member's exposure history.

The individualized questions therefore cannot be dismissed as mere issues of damages that can be addressed after resolution of common liability. *See* [ECF Nos. 432, at 4; 503, at 1]. Although individualized damages do not necessarily defeat predominance, *see Tyson Foods*, 577 U.S. at 453–54, the individualized issues here go to the core of Plaintiffs' claims and the resultant damage award. In *Ward v. Dixie Nat. Life Ins. Co.*, the Fourth Circuit concluded the district court did not

abuse its discretion in determining the damage calculation was not individualized because "the formula for damages was identical for all class members." 595 F.3d 164, 180 (4th Cir. 2010); *see also Doe v. Chao*, 306 F.3d 170, 183–84 (4th Cir. 2002) (affirming district court's denial of class certification because the class members' "emotional damages [were] likely to be so variable and fact-specific that damages issues overwhelm liability"). No such possibility exists in this case. Nor would a class-wide determination that EtO was emitted, that the emissions can be modeled, or even that cumulative exposure within the Class Zone can produce the requisite increased risk establish that either of Defendants' own emissions were a legally sufficient cause of each class member's risk.

Indeed, the very feature of Dr. Sahu's model on which Plaintiffs rely—that it can distinguish emissions by source and time—underscores the individualized nature of the inquiry. If the model could produce only a single, undifferentiated estimate of total EtO exposure, Plaintiffs might argue that individual source attribution was unnecessary. But Plaintiffs contend that the model can identify Covestro's contribution separately. Once that contribution is identified, however, the Court must confront the defendant-specific causation and fault-allocation questions that follow from it. The model may provide common evidence relevant to those questions, but it does not provide a common answer to them.

Nor does the fact that these questions can be addressed using a common methodology transform them into common questions. Rule 23(b)(3) requires more than a common method of analysis; it requires that the common evidence be capable of resolving an issue in a manner applicable across the class. *See Tyson Foods*, 577 U.S. at 453; *Stafford*, 123 F.4th at 679. Here, the same modeling methodology produces different exposure estimates based on each class

member's location and period of residence, and those individualized exposure estimates then inform the separate legal inquiries into causation, fault-allocation, and resultant damages.

The common question whether Defendants' emissions can be modeled through Dr. Sahu's air-dispersion modeling does not provide a common answer to the legally dispositive questions of whether each defendants emissions caused a particular class member's requisite increased risk and, if so, what percentage of fault should be allocated to each defendant under § 55-7-13c. Those questions must be answered separately for class members whose exposure histories differ in location, duration, and timing. Because they concern the elements necessary to establish each defendants' liability—not merely the amount of each class member's damages—these individualized inquiries predominate over the common questions concerning atmospheric dispersion and generalized risk.[30]

ii. Individual inquiries regarding a putative class member's "significant exposure" and "increased risk" predominate

The proposed class is defined to contain only people whose modeled cumulative exposure produces at least a one-in-10,000 increased risk of the three specified cancers. [ECF Nos. 313; 314]. According to Plaintiff, the experts supply necessary links in the chain. Dr. Sahu models EtO

---

[30] As a leading treatise has acknowledged, putative medical monitoring classes face a steep predominance burden—one that Plaintiffs have failed to satisfy here.

> Proof of each class member's entitlement to relief will require numerous, complex individualized inquiries for each class member on issues such as their general and specifically relevant health history and condition; the frequency, or duration, or consistency of any current or previous use of exposure to a particular substance or product; the causation of any existing, alleged injuries; their alleged risk of any particular condition associated with exposure to a particular substance or product and need for medical monitoring; the adequacy of any labeling and availability of information during the specific time frame that each class member was exposed to the product or substance; if applicable, the information provided to class members and their doctors before beginning voluntary usage of a product; and applicable affirmative defenses.

§ 5:47. Rule 23(b)(3)—Application of predominance requirement to particular cases—Medical monitoring claims, 1 McLaughlin on Class Actions § 5:47 (22nd ed.). Other procedural tools exist to consolidate proceedings, however, including multidistrict litigation under 28 U.S.C. § 1407, which this court is well-acquainted with.

in the air to determine a putative class member's cumulative exposure; Dr. Stayner supplies general causation testimony that EtO increases the risk of the identified cancers; Dr. Wells calculates a putative class member's increased risk of developing those cancers based on Dr. Sahu's calculation of cumulative exposure; Dr. Knopf then says a qualified physician would prescribe a monitoring program to everybody at that risk level and crafts a monitoring program to serve as common evidence of the necessity of periodic monitoring and existing medical procedures.

Plaintiff therefore asserts the decisive medical question itself—Is a one-in-10,000 increased risk sufficient to make monitoring medically necessary?—predominates. But this circular analysis of the legally dispositive question is exactly the fail-safe issue identified above. Keeping in mind that the Fourth Circuit has cautioned courts to "exercise [class certification] discretion within the framework of Rule 23," *Oliver v. Navy Fed. Credit Union*, 167 F.4th 106, 114 (4th Cir. 2026) (citation omitted), I likewise analyze the issue as one of predominance as well.

While Dr. Wells can identify a threshold for "significant exposure" and "increased risk," and Dr. Knopf can give his opinion regarding his medical monitoring program, as a means to attempt to commonly proves the elements of a medical monitoring claim for each proposed class member, *Rhodes*, 253 F.R.D. at 374, those answers do not resolve the litigation as to each putative class member. Instead, it is necessary to inquire into individual questions requiring "members of a proposed class . . . to present evidence that varies from member to member," *Tyson Foods*, 577 U.S. at 453, regarding whether it would be "reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure" in light of possible individual defenses. *Bower*, 522 S.E.2d at 432.

This defect exemplifies why classes may not be defined to condition class membership on the merits of a case such that an expert is expected to provide a class-wide answer to a legally

dispositive question to determine whether or not a putative class member may be considered part of the class or not. *See Overby, LLC*, 178 F.4th at 185 ("'[A] circular class definition,' can conceal underlying issues with commonality and predominance." (quoting *In re White*, 64 F.4th at 314)). Here, whether any putative class member's cumulative exposure produced the requisite increased risk necessarily varies with location relative to the source, duration and timing of residence, and individual risk factors. This variation is not resolved by common proof or even determinable until a jury decides whether all class members either win or lose.

In light of the circular class definition that requires inquiry into individual questions for each putative class member, Plaintiffs have not identified a class-wide methodology capable of resolving these issues. Absent such a methodology, individualized issues of exposure and risk predominate over the common questions. *See Comcast Corp.*, 569 U.S. at 34–35 (2013) (a model purporting to serve as evidence of predominance must actually be capable of measurement on a class-wide basis consistent with the theory of liability).

Plaintiffs have failed to establish a number of *Bower* elements could be shown through common proof. Instead, determination as to those elements for each class member will require an individualized inquiry. Here, questions of law or fact common to class members do not predominate because individualized inquiries regarding causation, fault-allocation, resultant damages, "significant exposure," and "increased risk" predominate. *See* Fed. R. Civ. P. 23(b)(3).

b. Superiority

Finally, superiority is lacking because Plaintiff has not shown a class action is in fact the best and most efficient manner of adjudication—particularly in light of the aforementioned defects. The Rule 23(b)(3) superiority inquiry tests whether the proposed class action is in fact the *best* and most efficient manner to adjudicate the relevant controversy. Notably, I consider all the relevant

factors Rule 23 identifies, but particularly "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

Here, in light of the circular, fail-safe, and overbroad class definition, I would be "inadvertently . . . 'lump[ing] together' a great many 'disparate plaintiffs with widely varying individual claims.'" *Overby*, 178 F.4th at 185 (citing *Bojangles*, 123 F.4th at 681) (citation modified). Accordingly, the class members' interest in individually controlling the prosecution or defense of separate actions outweigh the considerations warranting adjudication by representation. Likewise, the proposed class would be too difficult to manage in that there are ascertainability, typicality, and predominance defects in the proposed class definition.

Accordingly, the proposed class therefore cannot satisfy Rule 23(b)(3). Nor, as the court previously acknowledged can the proposed class satisfy Rule 23's ascertainability or typicality requirements. And, as defined, it is a fail-safe class. While Rule 23(c)(1)(C) grants district courts broad discretion to alter or amend a proposed class prior to final judgment, I decline to restructure Plaintiff's proposed class definition at this stage—particularly given the fatal pleading defect identified. Moreover, Plaintiff Sommerville bears the burden of proposing a class structure that satisfies the requirements of Rule 23. *Mr. Dee's Inc.*, 127 F.4th at 931 ("[I]t is the burden of the party seeking class certification, not the district court's, 'to demonstrate compliance with Rule 23.'" (quoting *EQT Prod. Co.*, 764 F.3d at 358)); *Lienhart*, 255 F.3d at 146 ("The party seeking class certification bears the burden of proof."); *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 700 (4th Cir. 2011). She has not done so. Accordingly, Plaintiff's Motion to Redefine the Class, [**ECF No. 493**], is **DENIED**, and Plaintiff's Motion to Certify Class, [**ECF No. 313**], is **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Redefine the Class, [**ECF No. 493**], is **DENIED**, and Plaintiff's Motion to Certify Class, [**ECF No. 313**], is **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER: October 16, 2026

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE